IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

JOHN ANTHONY ESPOSITO,    :
    :
       Petitioner,    :
    :
    vs.    :   CIVIL ACTION NO. 5:12-CV-163 (CAR)
    :
CARL HUMPHREY, Warden,    :
    :
       Respondent.  :
_____  :

## ORDER

**JOHN ANTHONY ESPOSITO** petitions the Court for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.   For the reasons discussed below, Esposito's petition is

**DENIED**.

## I.   BACKGROUND AND PROCEDURAL HISTORY

### A.   Facts

The evidence at trial, which included 21 year-old Esposito's confession to federal

authorities, showed that he and his codefendant, 19 year-old Alicia Woodward, both

residents of New Jersey, arrived in Lumberton, North Carolina around September 15,

1996.   (Docs. 13-12 at 14; 14-6 at 83).[1]   After running out of money, they decided to rob

and murder someone.   (Doc. 14-15 at 50).   Esposito explained that he thought about

robbing a younger woman, but ultimately decided an elderly person would be better

_____

[1] Because all documents have been electronically filed, this Order cites to the record by using the
document number and electronic screen page number shown at the top of each page by the
Court's CM/ECF software

because "'old people can't defend themselves. They don't have the motor skills to fight or run.'" (Doc. 14-15 at 58, 62). On Thursday, September 19, 1996, he and Woodward sat in the parking lot of a Winn-Dixie grocery store and waited for a potential victim. (Docs. 14-7 at 57-59; 14-15 at 50).

Lumberton resident Lola Davis, a 90 year-old retired high school librarian, took care of her 87 year-old husband, who suffered from Parkinson's disease and required constant assistance. (Docs. 14-6 at 66-70; 14-7 at 28-31). Mrs. Davis left him in the care of a health care attendant only once per week—for two to three hours each Thursday so she could have her hair done and buy groceries. (Docs. 14-6 at 70; 14-7 at 31, 37).

On Thursday, September 19, 1996, Mrs. Davis drove her 1978 Buick to Peggy's Beauty Salon, where she had been a regular client for seventeen years. (Docs. 14-6 at 73, 77; 14-7 at 15-18, 34). She had her hair styled and then drove to Winn-Dixie to buy groceries. (Doc. at 14-7 at 18). When Mrs. Davis exited the grocery store, Woodward approached her. (Docs. 14-7 at 89-91; 14-8 at 4). Woodward told Mrs. Davis that she was scared of, and needed to get away from, her boyfriend and asked for a ride out of the parking lot. (Doc. 14-15 at 51). Mrs. Davis agreed to help and drove Woodward to the rear of the grocery store, where Esposito jumped into the backseat of her car. (Doc. 14-15 at 51-52).

Esposito threatened to kill Mrs. Davis if she did not cooperate. (Doc. 14-15 at 51-52). He and Woodward had Mrs. Davis move to the passenger seat and Woodward

started driving. (Doc. 14-15 at 52). They told Mrs. Davis to write a check for $300.00 made payable to cash and she complied. (Doc. 14-15 at 52). On the way to the bank to cash the check, Esposito went through Mrs. Davis' purse and found approximately $1,000.00. (Doc. 14-15 at 52). They went through the drive-through window at the bank and cashed the $300.00 check. (Doc. 14-8 at 40, 44). The bank teller later identified both Woodward and Esposito. (Doc. 14-8 at 43, 46).

With Mrs. Davis in the passenger seat, they travelled approximately 300 miles from Lumberton, North Carolina to Madison, Georgia.[2] (Doc. 14-8 at 17-18). This trip took approximately five hours. (Doc. 14-8 at 18). They exited the interstate in Morgan County, Georgia and drove down a dirt road. (Docs. 14-8 at 86; 14-9 at 28). Esposito had Mrs. Davis exit the vehicle, kneel on the ground, and he proceeded beat her to death with a tree limb, and other "'stuff on the ground.'" (Doc. 14-15 at 55). In his confession, Esposito said he didn't "'have any remorse'" for murdering Mrs. Davis; he didn't "'have a conscience.'" (Doc. 14-15 at 56)

When Mrs. Davis failed to return home on the afternoon of September 19, Mr. Davis became concerned and phoned the Sheriff's department. (Docs. 14-7 at 33; 14-8 at 7-10). A missing persons report was filed that day. (Docs. 14-7 at 33; 14-8 at 7-10). The next day, Mr. Davis learned that his wife had been killed and her body had been

---

[2] Esposito and Woodward had traveled from New Jersey to North Carolina in Woodward's Pontiac Grand Am, but they abandoned that vehicle in the Winn-Dixie parking lot. They travelled to Georgia in Mrs. Davis' Buick. (Docs. 14-8 at 14; 14-15 at 53).

found in Georgia.    (Docs. 14-7 at 34; 14-8 at 16).

A cattle ranch overseer discovered Mrs. Davis' body on September 20, 1996 under a large oak tree in a hayfield.    (Docs. 14-8 at 62, 70-73; 14-9 at 34).    Her head was "wedged and driven down into the tree root" and there was a large tree limb left on her body.    (Doc. 14-9 at 16, 56-57).    The forensic pathologist who performed the autopsy testified that Mrs. Davis died from blunt force trauma to her head.    (Doc. 14-12 at 73). He explained that she had significant blunt force injuries, including contusions, lacerations, and abrasions about her face, neck, and ears; cartilage was protruding from her left ear; there was extensive hemorrhaging and bruising in her scalp; she had significant brain injury as a result of the outside head trauma; and there were defensive wounds on her right hand and left wrist.    (Doc. 14-12 at 61-62, 68, 78).

After murdering Mrs. Davis, Esposito and Woodward headed to Alabama, where they abandoned her car and purse.    (Docs. 14-9 at 87; 14-15 at 56-57); *Esposito v. State*, 273 Ga. 183, 183, 538 S.E.2d 55, 57 (2000).    "Davis' automobile was shown at trial to contain fingerprints, palm prints, and footprints matching Esposito's and Woodard's. Saliva on a cigarette butt found in the automobile was shown to contain DNA consistent with Esposito's DNA."    *Esposito*, 273 Ga. at 183, 538 S.E.2d at 57.

Evidence presented at the sentencing phase showed that, after killing Mrs. Davis, Esposito bludgeoned to death two more elderly people.    In Alabama, Esposito and Woodward boarded a Greyhound bus and headed west to Oklahoma City.    (Doc. 14-17

at 49). When they ran out of money in Oklahoma City, they decided to find another elderly victim to rob and murder. (Doc. 14-17 at 51). To that end, they waited in the parking lot of a grocery store until they spotted Larry and Marguerite Snider[3] leaving the store. (Doc. 14-17 at 52; 14-18 at 8-9).

Esposito approached the couple, told them his car had broken down, and asked for a ride to a hotel. After Mr. Snider agreed and started driving, Esposito had him pull over, grabbed him around the neck, and told him that he would kill Mrs. Snider if he failed to do as he was told. (Doc. 14-17 at 53). When Mr. Snider resisted, Esposito hit him in the face. (Doc. 14-17 at 53). With Woodward driving, they stopped at an automatic teller machine, where Esposito made Mr. Snider withdraw money from his account. (Doc. 14-17 at 53-54). They continued down the interstate until Esposito directed Woodward to exit and drive into a "large field with a dirt road that ran down the middle."[4] (Doc. 14-17 at 54-55).

After retrieving a tire iron from the trunk of the car, Esposito had Mr. Snider exit the car and he proceeded to hit him in the head with the tire iron until Mr. Snider fell to the ground. (Doc. 14-17 at 56). In his confession, Esposito explained that killing Mr. Snider "'wasn't too bad. I did not get any brains on my face or anything.'" (Doc. 14-17 at 56). Esposito then drug Mr. Snider to a grassy area next to the car and left him there.

---

[3] Mr. Snider was ninety at the time and his wife was eighty-six. (Doc. 14-18 at 8-9).
[4] By this time, they had been driving five or six hours and were in Oldham County, Texas. (Doc. 14-19 at 82-83).

(Doc. 14-17 at 57).

Esposito returned to the car, pulled Mrs. Snider out of the backseat, and hit her in the head with the tire iron.   (Doc. 14-17 at 57).   When she fell to the ground, he hit her again in the chin and in the right side of her face.   (Doc. 14-17 at 57).   In his confession, Esposito explained that hit her four times until he saw her "skull, 'pop up.'"   (Doc. 14-17 at 57).   He drug Mrs. Snider and placed her next to Mr. Snider.   He confessed that when he placed Mrs. Snider next to her husband, Mr. Snider was not breathing and Mrs. Sniders' "eyes were open and one eye was looking at him and one eye was 'coming out of her head.'"   (Doc. 14-17 at 58).   He confessed that "he would never forget that sight … she was breathing 'real hard'"…not blinking" and "'[y]ou could have thrown dirt in her eyes and she wouldn't have blinked.'"   (Doc. 14-17 at 58).   He "recalled seeing brain matter on the side of [Mrs. Snider's] face."   (Doc. 14-17 at 58).

Esposito told authorities that Woodward had thrown the tire iron into the field, but she "'didn't do anything'"; he was the one who killed the Sniders.   (Doc. 14-17 at 59-60).   As with Mrs. Davis' murder, Esposito said he had no remorse for killing Mr. and Mrs. Snider.   He explained, "'I don't have a conscience.   I really don't care.'" (Doc. 14-17 at 60).

After killing the Sniders, Esposito and Woodward took the Snider's car and drove to Colorado, where they were finally arrested on October 2, 1996 in Mesa Verde National Park.   (Docs. 14-14 at 35-42; 14-17 at 61).   Esposito explained that had they not been

arrested, their plan was to "go to the Wal-mart, which is located in Cortez, rob and murder another elderly woman and use the money to fly to San Diego." (Doc. 14-17 at 62).

**B. Procedural history**

On September 30, 1998, a jury found Esposito guilty of malice murder, felony murder, armed robbery, and hijacking a motor vehicle. *Esposito,* 273 Ga. at 183 n.1, 538 S.E.2d at 57 n.1. He was sentenced to death for the crime of malice murder, and the Georgia Supreme Court affirmed his conviction and sentence on October 30, 2000. *Id.* at 183, 538 S.E.2d at 57.

After the Georgia Supreme Court denied his motion for reconsideration and the United States Supreme Court denied his petition for writ of certiorari, Esposito filed a petition for writ of habeas corpus in the Superior Court of Butts County on May 3, 2002. (Docs. 15-19 to 15-21; 15-23; 15-25). He amended the petition on November 6, 2006 and, after a three-day evidentiary hearing on September 4, 5, and 6, 2007, the court denied relief in an order dated April 5, 2011. (Docs. 17-2; 17-8 to 27-23; 27-39). The Georgia Supreme Court denied Esposito's application for a certificate of probable cause to appeal ("CPC application") on March 19, 2012. (Docs. 27-41 to 27-42; 27-44).

On May 8, 2012, Esposito filed a Petition for Writ of Habeas Corpus by a Person in State Custody in this Court. (Doc. 1). The Respondent filed his answer and the Court denied Esposito's motion for discovery, motion for an evidentiary hearing, and renewed

motion for an evidentiary hearing.   (Docs. 10, 37, 42, 65).   Both parties have now

briefed the issues of exhaustion, procedural default, and the merits of any remaining

claims.   (Docs. 54 to 58).

## II.   STANDARD OF REVIEW

### A.  Exhaustion and procedural default

Procedural default bars federal habeas relief when a habeas petitioner has failed

to exhaust state remedies that are no longer available or when the state court rejects the

habeas petitioner's claim on independent state procedural grounds.   *Frazier v. Bouchard*,

661 F.3d 519, 524 n.7 (11th Cir. 2011); *Ward v. Hall*, 592 F.3d 1144, 1156-57 (11th Cir. 2010).

There are two exceptions to procedural default.   If the habeas respondent

establishes that a default has occurred, the petitioner can overcome the default by

establishing "cause for the failure to properly present the claim and actual prejudice, or

that the failure to consider the claim would result in a fundamental miscarriage of

justice."   *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) (citing *Wainwright v. Sykes*,

433 U.S. 72, 81-88 (1977)).   A petitioner establishes cause by demonstrating that some

objective factor external to the defense impeded his efforts to raise the claim properly in

the state courts.   *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010)

(quoting *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003)).   A petitioner

demonstrates prejudice by showing that there is a reasonable probability that the result

of the proceedings would have been different.   *Id*.   Regarding what is necessary for a

petitioner to establish a fundamental miscarriage of justice, the Eleventh Circuit has

stated:

> To excuse a default of a guilt-phase claim under [the
> fundamental miscarriage of justice] standard, a petitioner must
> prove a constitutional violation has probably resulted in the
> conviction of one who is actually innocent.   To gain review of a
> sentencing-phase claim based on [a fundamental miscarriage of
> justice], a petitioner must show that but for constitutional error at
> his sentencing hearing, no reasonable juror could have found him
> eligible for the death penalty under [state] law.

*Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996) (citations and quotation marks omitted).

### B.  Review of claims that were adjudicated on the merits in the state courts

Under AEDPA,[5]  this Court may not grant habeas relief with respect to any claim

that was adjudicated on the merits in state court unless the state court's decision was (1)

contrary to clearly established Federal law; (2) involved an unreasonable application of

clearly established Federal law; or (3) was based on an unreasonable determination of

the facts in light of the evidence presented in the state court proceeding.   28 U.S.C. §

2254(d)(1)-(2); *see also Harrington v. Richter*, 131 S. Ct. 770 (2011).   The phrase "clearly

established Federal law" refers to the holdings of the United States Supreme Court that

were in existence at the time of the relevant state court decision.   *Thaler v. Haynes*, 559

U.S. 43, 47 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1) are

separate bases for reviewing a state court's decisions."   *Putman v. Head*, 268 F.3d 1223,

---

[5]  The Antiterrorism and Effective Death Penalty Act of 1996.

1241 (11th Cir. 2001) (citing *Williams*, 529 U.S. at 404-05).

> Under § 2254(d)(1), "[a] state court's decision is 'contrary to'... clearly
> established law if it 'applies a rule that contradicts the governing law set
> forth in [the United States Supreme Court's] cases' or if it 'confronts a set of
> facts that are materially indistinguishable from a decision of [the United
> States Supreme] Court and nevertheless arrives at a [different] result....'"

*Michael v. Crosby*, 430 F.3d 1310, 1319 (11th Cir. 2005) (quoting *Mitchell v. Esparza*, 540 U.S.

12, 15-16 (2003)).

A state court's decision involves an "unreasonable application" of federal law

when "'the state court identifies the correct governing legal rule but unreasonably

applies it to the facts of the particular state prisoner's case, or when it unreasonably

extends, or unreasonably declines to extend, a legal principle from Supreme Court case

law to a new context.'" *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir.

2012) (quoting *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011)). An "unreasonable

application" and an "incorrect application" are not the same:

> We have explained that an *unreasonable* application of federal law is
> different from an *incorrect* application of federal law. Indeed, a federal
> habeas court may not issue the writ simply because that court concludes in
> its independent judgment that the relevant state-court decision applied
> clearly established federal law erroneously or incorrectly. Rather, that
> application must be objectively unreasonable. This distinction creates a
> substantially higher threshold for obtaining relief than *de novo* review.
> AEDPA thus imposes a highly deferential standard for evaluating
> state-court rulings, and demands that state-court decisions be given the
> benefit of the doubt.

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and quotation marks omitted).

Pursuant to 28 U.S.C. § 2254(d)(2), district courts can "grant habeas relief to a

petitioner challenging a state court's factual findings only in those cases where the state court's decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Price v. Allen*, 679 F.3d 1315, 1320 (11th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(2)). A state court's determination of a factual issue is "presumed to be correct," and this presumption can only be rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Within this framework, the Court reviews Esposito's claims.

## III. ESPOSITO'S CLAIMS

**A. Claim One: Petitioner was deprived of his right to the effective assistance of counsel at trial and on appeal, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

1. The clearly established federal law and deference

*Strickland*[6] is "the touchstone for all ineffective assistance of counsel claims." *Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008). "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient…. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. Esposito "must meet both the deficient performance and prejudice prongs of *Strickland*" to obtain relief. *Wong v. Belmontes*, 558 U.S. 15, 16 (2009). To establish deficient performance, he must

---

[6] *Strickland v. Washington*, 466 U.S. 668 (1984).

show that "counsel's representation fell below an objective standard of reasonableness."

*Strickland*, 466 U.S. at 688. The Court must apply a "'strong presumption' that counsel's

representation was within the 'wide range' of reasonable professional assistance."

*Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689). "To overcome that

presumption, [Esposito] must show that counsel failed to act 'reasonabl[y] considering

all the circumstances.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting

*Strickland*, 466 U.S. at 688). To establish prejudice, Esposito must show "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.* When

determining if prejudice exists, "it is necessary to consider *all* the relevant evidence that

the jury would have had before it if [Esposito's counsel] had pursued the different path–

not just the mitigation evidence [his counsel] could have presented, but also the

[aggravating evidence] that almost certainly would have come in with it." *Wong*, 558

U.S. at 20; *see also Porter v. McCollum*, 558 U.S. 30, 40-41 (2009).

    Federal courts must "take a 'highly deferential' look at counsel's performance

through the 'deferential lens of § 2254(d).'" *Pinholster*, 131 S. Ct. at 1403 (quoting

*Strickland*, 466 U.S. at 689; *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)). Thus,

Esposito must do more than satisfy the *Strickland* standard. "He must also show that in

rejecting his ineffective assistance of counsel claim the state court 'applied *Strickland* to

the facts of his case in an objectively unreasonable manner.'" *Rutherford v. Crosby*, 385

F.3d 1300, 1309 (11th Cir. 2004) (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)). That is,

"[t]he question is not whether counsel's actions were reasonable [but] whether there is

any reasonable argument that counsel satisfied *Strickland's* deferential standard."

*Richter*, 131 S. Ct. at 788.

Esposito argues that "two particular errors of law … fundamentally mar the

habeas court's legal analysis" and, therefore, this Court should conduct a *de novo* review

of several of [his] ineffectiveness claims." (Doc. 56 at 34). First, Esposito maintains this

Court is unconstrained by § 2254's deference in relation to *Strickland's* prejudice prong

because the state habeas court's reliance on *Lockhart*[7] constituted an unreasonable

application of clearly established federal law. (Doc. 56 at 34-36). Second, he claims the

state habeas court's rejection of several ineffective assistance claims was unreasonable

because the "court erred as a matter of law in relying on counsel's fear of 'opening the

door' to the state's presentation of an illegal custodial statement." (Doc. 56 at 36)

(emphasis omitted).

The short answer to both of these arguments is that the state habeas court's

analysis and reasoning are irrelevant. After the state habeas court denied relief,

Esposito filed, and the Georgia Supreme Court summarily denied, his CPC application.

(Docs. 27-41 to 27-42, 27-44). The Eleventh Circuit recently explained that the relevant

---

[7] *Lockhart v. Fretwell*, 506 U.S. 364 (1993).

state court decision for AEDPA purposes is the Georgia Supreme Court's summary denial of a petitioner's CPC application, not the superior court's denial of his state habeas petition. *Hittson v. GDCP Warden*, 759 F.3d 1210, 1231-32 (11th Circ. 2014). This Court is not to "review the reasoning given in the Butts County Superior Court decision; rather, [it] review[s] the decision of the Georgia Supreme Court, in accordance with *Richter's* instructions." *Id*. at 1232 n.25. Because the Georgia Supreme Court did not explain its decision, "[o]ur task … is to review the record before the Georgia Supreme Court to 'determine what arguments or theories supported or, … could have supported, the state court's decisions.'" *Id*. at 1232 (quoting *Richter*, 131 S. Ct. at 786). Under this standard, Esposito "may only obtain federal habeas relief 'by showing there was no reasonable basis for the [Georgia Supreme] [C]ourt to deny relief.'" *Id*. at 1233 (quoting *Richter*, 131 S. Ct. at 784).

However, assuming for the sake of argument that the Butts County Superior Court's analysis is relevant, AEDPA deference still applies. First, the Court finds that the superior court did not unreasonably apply *Lockhart*. The complete "prejudice prong" analysis in the "legal standard" section of the superior court's order reads as follows:

> In <u>Strickland</u>, the Supreme Court held that there is prejudice stemming from ineffective assistance of counsel if there is a reasonable probability that, absent the deficiencies, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 694. The Supreme Court in <u>Lockhart</u> further defined the "prejudice" component of <u>Strickland</u>, holding that "an analysis focusing solely on mere outcome determination, without attention

to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law the does not entitle him. Lockhart, 506 [U.S.] at 369-70.

In Smith v. Francis, 253 Ga. at 783, the Supreme Court of Georgia interpreted the prejudice prong to require that a petitioner prove that the outcome of the proceedings would have been different. "In order to establish that trial counsel's performance was so defective as to require a new trial, [the Petitioner] must show that counsel's performance was deficient and that the deficient performance so prejudiced [the Petitioner] that there is a reasonable likelihood that, absent counsel's errors, the outcome of the trial would have been different." Roberts v. State, 263 Ga. 807, 807-808 (1994). "Regarding death penalties, the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Smith v. Francis, 253 [Ga.] at 783-784.

In the instant case, this Court has applied the guiding principles set forth in Strickland and its progeny, as adopted by the Georgia Supreme Court, i.e., according a strong presumption of effectiveness to counsel's conduct; viewing counsel's representation objectively from the perspective of counsel at the time of trial; refusing to engage in hindsight analysis; presuming the reasonableness of judgment calls and trial strategy; acknowledging that even the most qualified counsel would likely represent a capital litigant differently; and recognizing that even the most experienced and effective attorney might be unable to prevent the imposition of the death penalty in a particular case. This Court finds that Petitioner failed to establish that counsel's performance "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. This Court also finds that Petitioner failed to establish that, but for alleged errors or omissions by counsel, there is a reasonable probability that the result of the proceeding would have been different. Id. at 694. Accordingly, this Court hereby denies habeas corpus relief as to the entirety of Petitioner's claims of ineffective assistance of counsel.

(Doc. 27-39 at 18-19).

While the state habeas court cited *Lockhart*, as other courts have done,[8] it clearly stated that its prejudice analysis was governed by "<u>Strickland</u> and its progeny." (Doc. 27-39 at 19). Also, the court found Esposito had not established prejudice because he failed to "establish that, but for alleged errors or omissions by counsel, there is a reasonable probability that the result of the proceeding would have been different." (Doc. 27-39 at 19). This the correct prejudice standard under *Strickland*.

Furthermore, when the state habeas court analyzed each of Esposito's individual ineffective assistance claims, it applied only the *Strickland* prejudice analysis. Discussing trial counsel's investigation and presentation of life history mitigation, the state habeas court found: "Because Petitioner … failed to prove that there is a reasonable probability that he suffered actual prejudice … Petitioner has failed to meet his burden under *Strickland*" (Doc. 27-39 at 21), and "even if the Court were to conclude that [counsel's] presentation … was deficient, Petitioner has failed to establish that he suffered any actual prejudice such that there is a reasonable probability that the outcome of the trial would have been different" (Doc. 27-39 at 29). Analyzing trial counsel's

---

[8] In *Rhode v. Hall*, 582 F.3d 1273 (11th Cir. 2009), the Eleventh Circuit, citing *Lockhart*, stated that "[t]he prejudice prong does not focus only on outcome; rather, to establish prejudice, the petitioner must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable." *Id*. at 1280 (citing *Lockhart*, 506 U.S. at 369)). In *Israel v. Sec'y, Fla. Dep't of Corr.*, 517 F. App'x 694, 698 (11th Cir. 2013), the Court cited *Lockhart* for the proposition that "there is no indication that Israel's sentencing was fundamentally unfair, or that its end result is unreliable." District courts have cited *Lockhart* for the general proposition that a habeas petitioner must demonstrate that "deficient performance prejudiced the defense." *See White v. Sec'y, Dep't of Corr.*, 2014 U. S. Dist. LEXIS 31296 at *10 n.5 (M. D. Fla., March 11, 2014); *West v. Sec'y, Dep't of Corr.*, 2014 U.S. Dist. LEXIS 16424 at *5 n.1 (M. D. Fla., Feb. 10, 2014).

investigation and presentation of mental health mitigation evidence, the state habeas court found: "[T]his Court further finds that Petitioner also failed to prove that the alleged deficient performance so prejudiced him that there is a 'reasonable likelihood that, absent counsel's errors, the outcome of the trial would have been different'" (Doc. 27-39 at 35), and "[w]ith regard to the evidence of Petitioner's mental health that was presented at the habeas hearing but not presented at trial, this Court is not persuaded that there is a reasonable probability that this additional evidence would have changed the outcome of the trial" (Doc. 27-39 at 35). Addressing trial counsel's failure to hire a forensic pathologist, the state habeas court explained: "Even if the Court were to find that such conduct constituted deficient performance, which the Court does not, this Court finds that Petitioner failed to establish a reasonable probability that such testimony would have affected the outcome of Petitioner's trial…." (Doc. 27-39 at 42). Thus, there are no indications that the state habeas court's prejudice analyses involved anything other than what is required by *Strickland*.[9] The court did not impose any additional requirements or make any separate inquiries into whether the outcome was "fundamentally unfair" under *Lockhart*. *Lockhart*, 506 U.S. at 843.

---

[9] The state habeas court did not conduct a prejudice analysis relating to trial counsel's investigation and rebuttal of the State's case, trial counsel's failure to present the polygraph expert, trial counsel's investigation and presentation of evidence to support their theories of relative culpability and reasonable doubt, or appellate counsel's performance. For these claims the state habeas court found a prejudice analysis was unnecessary because Petitioner did not prove deficient performance. (Doc. 27-39 at 35-44).

Esposito argues that the state habeas court's prejudice analysis was the same as that conducted by the Virginia Supreme Court in *Williams,* which the Supreme Court found was "'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Williams*, 529 U.S. at 367, 373 (quoting 28 U.S.C. § 2254(d)(1)) The Supreme Court faulted the state court for imposing additional requirements upon the habeas petitioner: "The Virginia Supreme Court read our decision in *Lockhart* to require a separate inquiry into fundamental fairness even when [the Petitioner] is able to show that his lawyer was ineffective and that his ineffectiveness probably affected the outcome of the proceeding."[10] *Williams*, 529 U.S. at 393. In Esposito's case, the state habeas court referenced *Lockhart* in its general discussion, but it conducted a straightforward *Strickland* analysis when it addressed each of Esposito's ineffective assistance allegations. Unlike the Virginia Supreme Court, it did not find trial counsel's "ineffectiveness probably affected the outcome of the proceeding," and then conduct a separate inquiry into fundamental fairness. Instead, it found that trial counsel's performance was not deficient and, even if it were, there was not a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. (Doc. 27-39 at 21, 29, 35, 42). This is the correct *Strickland* prejudice analysis.

---

[10] The Virginia Supreme Court "assumed without deciding," that trial counsel's performance had been defective. *Williams*, 529 U.S. at 371. In contrast, the state habeas court in Esposito's case found that trial counsel's performance had **not** been defective.

Esposito's second argument for *de novo* review of certain ineffectiveness claims is that the state habeas court erred as a matter of law in relying on counsel's fear of "opening the door" to the State's presentation of the illegal custodial statement.   (Doc. 56 at 36).   Again, assuming for the sake of argument that the Butt's County Superior Court's reasoning is relevant, Esposito's argument fails.

The record shows that following his arrest, Esposito confessed on two separate occasions to murdering Mrs. Davis and the Sniders.   First, on October 2, 1996, the day of his arrest, he confessed to Federal Bureau of Investigation ("FBI") Special Agent Ron Knight.   (Doc. 14-15 at 43-44).   On October 8, 1996, he confessed to Georgia Bureau of Investigation ("GBI") Agent James Wooten in a videotaped interview.[11]   (Doc. 13-12 at 4-10; Resp't Ex. 169-170).   Trial counsel sought to suppress both confessions.   (Doc. 13-11 at 3-4).   The trial court conducted a hearing on December 10, 1997 and ruled that Esposito's confession to Knight was admissible but reserved ruling on the videotaped confession to Wooten.   (Doc. 13-13 at 44-44).

In a September 11, 1998 pretrial hearing, the trial court indicated that the videotaped confession to Wooten should be suppressed and trial counsel presented a proposed order to the court.   The last sentence of the order read:   "[S]aid video statement and interrogation is hereby suppressed and the State is directed not to use

---

[11] Texas Ranger Alvin Schmidt and David Medlin with the Oldham County Sheriff's Department were also present during this interview and Schmidt questioned Esposito as well. (Doc. 13-7 at 26; Resp't Ex. 170).   Two DVDs containing this videotaped confession were manually filed with the Court and are in the record as Respondent's Exhibits 169 and 170.

such evidence in the prosecution against this Defendant."   (Doc. 13-5 at 77).   While the

prosecutor agreed that he should not "bring it up in [the] case in chief," he argued that

under *Harris v. New York*, 401 U.S. 222 (1971), he should be allowed to use the videotaped

confession for impeachment or rebuttal.   (Doc. 13-21 at 72).   His argument was that

Esposito, through his polygraph expert, sought to show that he "is not the one who

delivered the fatal blow" and the videotaped confession could be used as "rebuttal or

impeachment evidence of the result of that polygraph."[12]   (Doc. 13-21 at 73, 75).   The

trial judge stated he was "not ruling on that" and explained, "I'm going to state it this

way on the record.   I'm going to go ahead and sign his Order and state on the record

that my Order does not apply to possible use for impeachment or rebuttal and if that

comes up, a hearing will be held."   (Doc. 13-21 at 73, 75).   Trial counsel stated they

understood, but did not agree with, the court's ruling.   (Doc. 13-21 at 75- 76).   On the

order granting Esposito's motion to suppress the videotaped confession, the trial judge

wrote "this [o]rder does not apply to possible use for impeachment or rebuttal."   (Doc.

---

[12] Although Esposito provided to law enforcement the details of how he bludgeoned to death
the three elderly victims, he later changed his story and told counsel that Woodward was the
actual killer.   (Doc. 17-11 at 38-39).   Trial counsel received funds for, and hired, Kenneth
Blackstone, an expert in the area of administration and interpretation of polygraph
examinations.   (Doc. 17-9 at 85, 88).   Blackstone conducted a polygraph examination of
Esposito.   (Doc. 17-10 at 10-12).   The relevant questions he asked were:   (1) "Did you strike
Lola?"; (2) "Did you strike Lola with a tree limb immediately before her death?"; and (3) "Did
you kick Lola in the head immediately prior to her death?"   (Doc. 17-10 at 11-12).   Esposito
responded negatively to all three questions and Blackstone found his answers were
"non-deceptive."   (Doc. 17-10 at 17).

13-5 at 77).   Thus, the trial court left open the possibility that the videotaped confession might be shown to the jury.

During the state habeas evidentiary hearing, trial counsel explained they thought the "video confession was terrible for" Esposito and its presentation to the jury "would have [had] a devastating effect."   (Doc. 17-10 at 46).   Therefore, throughout the sentencing phase of the trial they were careful not to open the door to the possibility of having the videotape played for the jury.   Counsel explained:

> [B]etween [the District Attorney] and the judge, you know,… if anybody got up and was going to profess John's innocence, it at least had us concerned that that might be enough to do that.   And so I was cautious to try to tell [our] witnesses let's don't get into an area that could possibly open up a door and let some things in that would be devastating…. [W]e didn't want that confession to come in.

(Doc. 17-10 at 78).

The state habeas court accepted this justification as legitimate and reasonable, excusing some of trial counsel's challenged actions on the ground that counsel made the tactical decision to refrain from presenting certain evidence for fear of opening the door to the videotaped confession.   (Doc. 162 at 28-29, 42)   Esposito argues:

> Because the trial court erred as a matter of law in ruling that a videotaped confession that it had excluded … could nonetheless be admitted to rebut any evidence presented by the defense that contradicted the suppressed statement, defense counsel's so called "strategic" decisions to avoid presenting evidence suggesting that Mr. Esposito was not the killer or otherwise challenging the degree of his culpability were inherently unreasonable.   In turn, the state habeas court's reliance on this justification was an unreasonable application of clearly established federal law, and to the extent the court relied on this justification to find counsel

performed adequately, the habeas court's rulings are not entitled to any deference.

(Doc. 56 at 36-37).

The Court disagrees because the record reveals that the state habeas court's reliance on trial counsel's justification was reasonable. Contrary to Esposito's argument, the trial court did not "rul[e] that a videotaped confession that it had excluded … could nonetheless be admitted to rebut any evidence presented by the defense that contradicted the suppressed statement." (Doc. 56 at 36). Instead, it clearly left the issue open, explaining that, if necessary, it would hold a hearing to address the admissibility of the videotape in the future. (Doc. 13-21 at 73, 76). Given that the trial court had not definitively ruled on the scope of the confession's possible admission, it was reasonable for trial counsel to believe that the court might allow the statement to be admitted, even if, as Esposito argues, the statement's admission would be contrary to Supreme Court precedent.

According to Esposito, trial counsel's actions were not strategic; they simply were unaware of the applicable law contained in *James v. Illinois*, 493 U.S. 307 (1990). In *James*, the Supreme Court held that the impeachment exception to the exclusionary rule does not permit the prosecution to introduce illegally obtained evidence to impeach the testimony of defense witnesses. *Id.* at 309. Unfortunately, the record does not show if trial counsel were aware of *James* or not. At the state habeas evidentiary hearing, they were not questioned regarding their knowledge of *James*. Therefore, the Court agrees

with Respondent that Esposito's basis for alleging that trial counsel misunderstood the

law is speculative. "'An ambiguous or silent record is not sufficient to disprove the

strong and continuing presumption of counsel's competency. Therefore, where the

record is incomplete or unclear about [counsel]'s actions, we will presume that he did

what he should have done, and that he exercised reasonable professional judgment.'"

*Williams v. Allen*, 598 F.3d 778, 794 (11th Cir. 2010) (quoting *Chandler v. United States*, 218

F.3d 1305, 1314 n.15 (11th Cir. 2000)). Trial counsel may well have been concerned that

the trial court would admit the video confession despite contrary authority.[13] Thus,

their attempts to prevent such were reasonable, as was the state habeas court's reliance

on this justification.

Having determined that the state courts' ineffective assistance adjudications must

be afforded deference, the Court now considers the actions of counsel, the state courts'

determinations, and Esposito's various arguments.

2. Trial counsel's investigation and presentation of evidence during the mitigation phase of Esposito's trial

On October 10, 1996, the trial court appointed two experienced criminal defense

attorneys, Roy R. Kelly, III and Wiley Dan Roberts, to represent Esposito. (Doc. 13-1 at

---

[13] While it is unknown whether this trial court would have allowed the videotaped confession to impeach certain defense witnesses or rebut testimony that Esposito was not the one who bludgeoned the three victims, other trial courts have allowed the introduction of illegally obtained statements to rebut or impeach defense experts whose opinions are based, "to any appreciable extent," on the defendants' statements to the experts. *Wilkes v. United States*, 631 A.2d 880, 890-91 (D.C. 1993); *State v. DeGraw*, 196 W. Va. 261, 270, 470 S.E.2d 215, 224 (1996).

15). Kelly, who had been practicing law since 1974, concentrated on criminal defense, divorce, and real estate work. (Doc. 17-10 at 30). He had handled five death penalty cases prior to his appointment in Esposito's case. (Doc. 17-10 at 30). Two of his previous death penalty cases went to the jury and three ended in plea agreements. (Doc. 17-10 at 30). Roberts graduated from law school in the 1960s and, after working in the Navy and the Post Office, opened his private practice in 1969. (Doc. 17-11 at 5). He handled criminal cases, real estate, probate work, and some personal injury cases. (Doc. 17-11 at 6). Roberts had handled three previous death penalty cases. (Doc. 17-11 at 6-7). They all ended in pleas, but he had tried some noncapital murders. (Doc. 17-11 at 7, 40). Kelly and Roberts had worked together on one previous death penalty case. (Doc. 17-10-at 32).

Though they worked together to prepare for both phases of trial, trial counsel were aware there was a good chance Esposito would be found guilty and, therefore, they realized their realistic goal was to save him from the death sentence. (Doc. 17-10 at 34-35, 43, 65). While Kelly and Roberts originally hoped to do some of the mitigation investigation work themselves, they ultimately decided to hire an investigator. (Docs. 13-16 at 3-4). The Georgia Indigent Defense Counsel recommended Hector Guevara. (Doc. 17-10 at 47). In a March 1998 pretrial hearing, counsel explained to the trial court that they needed to hire Guevara to locate and interview witnesses "specifically for sentencing phase mitigation type testimony." (Doc. 13-16 at 5). Counsel requested

$20,000, explaining that Guevara would need to interview numerous people who resided in various states. (Doc. 13-16 at 5). The trial court expressed concern, explaining that "it seems extremely high," but eventually agreed to the amount because "witnesses [were] scattered over such a wide area of the country." (Docs. 13-16 at 7-8; 13-18 at 4-7).

Trial counsel and Guevara regularly visited Esposito, whom counsel described as cooperative. (Doc. 17-10 at 33-34; 17-11 at 8-9). Guevara questioned Esposito extensively about his background on numerous occasions. (Docs. 20-2 at 45-80, 20-3 at 1-42). Esposito provided Guevara with names of numerous potential mitigation witnesses. (Doc. 19-27 at 3-5). Guevara interviewed the suggested witnesses that he could locate, along with many additional people from Esposito's past. (Docs. 19-22 at 5-17; 20-1 at 1-16, 25-28; 20-2 at 2-11; 21-42). Guevara provided counsel with an alphabetized list of more than 80 people he interviewed. (Doc. 20-1 at 25-28). These individuals included family members, friends, teachers, high school coaches, school administrators, school counselors, psychiatrists, psychologists, social workers, mental health counselors, and army recruiters. (Doc. 20-1 at 25-28).

Guevara met with counsel regularly and provided them with hundreds of pages of written reports detailing his interviews with Esposito and potential mitigation witnesses. (Docs. 17-10 at 52; 19-26 at 63-70; 19-27 at 23-46; 20-1 at 2-86; 20-2 at 1-80; 20-3 at 1-78; 20-4 at 1-79; 20-5 at 1-5; 20-6 at 2-69, 74-82; 20-7 at 1-69). These included "A

Social History," containing detailed information about Esposito's family, childhood, sexual abuse, problems in school, mental problems, treatment in mental facilities, self-mutilation, time in the Army reserves, and his relationship with a prior girlfriend. (Doc. 19-27 at 33-46).   Also included was information about domestic abuse and violence in his family, drug and alcohol abuse in his family, his mother's promiscuity, his mother's compulsive and inappropriate behaviors, his biological father's imprisonment, and Esposito's friends' opinions of Woodward.   (Doc. 19-27 at 33-46). Guevara also provided trial counsel with a ten page "Analysis of Mitigation Factors," and a detailed timeline of Esposito's life history and mental treatment history.   (Docs. 19-27 at 23-32; 20-1 at 2-21).

Guevara and trial counsel obtained extensive records, including:   (1) enlistment and discharge records from the U.S. Army Reserves; (2) medical and mental health records, including tests and evaluations, from Kennedy Memorial Hospital ("Kennedy"), Ancora State Hospital ("Ancora"), Transitional Residence Independent Services, Inc. ("TRIS"), Central State Hospital, Underwood Memorial Hospital ("Underwood"), and Southeastern Regional Medical Centers; (3) records from W. Deptford Police Department, Paulsboro Police Department, New Jersey State Police, Georgia Police, FBI, GBI, Colorado Police, and Colorado Department of Natural Resources; (4) Jasper County Jail Records; (5) school records; and (6) psychological evaluations from Esposito's high school.   (Docs. 20-1 at 22-24; 20-2 at 40-42).

Trial counsel were aware that Esposito had mental health problems that should be explored. (Doc. 17-10 at 35). They obtained Esposito's mental health records from the prosecutor's files and from Guevara. (Doc. 17-10 at 51, 57, 68-69). Guevara interviewed various mental health professionals who had treated Esposito in the past and provided trial counsel with reports detailing the information obtained during these interviews. (Docs. 20-3 at 44-45, 64-65, 72-78; 20-4 at 1-29). Trial counsel retained neuropsychologist Dr. Daniel Grant, who was recommended by the Georgia Indigent Defense Council,[14] to evaluate Esposito and "see what mitigation factors could be determined." (Doc. 17-10 at 57, 71). Grant was provided Dr. Jerold S. Lower's[15]

_____

[14] The Georgia Indigent Defense Council also recommended Ofelia Gordon, a social worker. (Doc. 17-10 at 48). Trial counsel contacted her in 1997 and she met with Esposito for two hours on January 7, 1998. (Doc. 17-13 at 9-10). Afterwards, Guevara met with Gordon to "get her ideas on what she feels is wrong with … Esposito." (Doc. 20-2 at 13). Guevara reported to trial counsel that Gordon could not tell them much that they did not already know from their interviews with Esposito and others. (Doc. 20-2 at 13). Guevara also reported that Gordon found Esposito was evasive, had no major psychotic problems, felt little remorse for his actions, seemed to lack a conscience, probably had a personality disorder, and that Esposito's suicide attempts were just "a way for him to get into a hospital and that they conveniently occurred when he was about to become homeless." (Doc. 20-2 at 13). Given this, trial counsel decided not to use Gordon. (Doc. 17-13 at 21).

[15] The trial court ordered forensic psychologist Dr. Jerold S. Lower to evaluate Esposito to determine his "competency to stand trial and criminal responsibility." (Doc. 20-30 at 60). The order also called for Lower to assess "whether the defendant meets the definition of 'mentally ill' or 'mentally retarded.'" (Doc. 20-30 at 60). Lower diagnosed Esposito as suffering from "a personality disorder characterized by poor judgment and impulse control, inability to form close relationships with others, disregard for social mores, shifting and unstable emotional attachments, inability to assume responsibility for his situation in life, and related characteristics." (Doc. 18-11 at 17). Lower found Esposito was competent to stand trial, understood right from wrong, and was not mentally ill or mentally retarded. (Doc. 18-11 at 17). Lower opined that Esposito did not suffer "from a serious, treatable mental disorder" and that his personality disorder would "likely be highly resistant to any known type of intervention." (Doc. 18-11 at 17-18).

psychiatric report; discharge summaries and progress notes from Kennedy, Underwood, and Ancora; school records; and Guevara's interview notes. (Docs. 17-13 at 31; 18-11 at 15-24, 31-39; 18-13 at 31-77; 18-14 at 1-75; 18-15 at 1-19). Grant never asked for additional records and, if he had, counsel would have provided them. (Doc. 17-10 at 73). Grant spoke with Angela Caraccillo, one of Esposito's prior therapists. (Doc. 14-24 at 39). He interviewed Esposito and administered intelligence, problem solving, language, educational, personality, and neuropsychological tests. (Doc. 17-13 at 32). After Grant's evaluation, trial counsel reviewed his conclusions, spoke with him, and decided to call him to testify about Esposito's difficult childhood, the physical and sexual abuse Esposito suffered, and Esposito's various traumatic experiences. (Doc. 17-10 at 72).

Trial counsel had two mitigation themes. They hoped to paint Woodward as the leader or "brains" of the duo. (Doc. 17-10 at 39). They also wanted to put up mitigation witnesses to show that while Esposito had problems, he had some redeemable features and characteristics. (Doc. 17-10 at 59, 72). According to trial counsel, they were "quite frankly, trying to … get some sympathy from the jury to spare this young man's life." (Doc. 17-10 at 59-60).

During the mitigation phase, trial counsel called seven witnesses. The first was Judy Holloway, the Chief Jailer at the Jasper County Jail, who testified that she had daily contact with Esposito and he been a model inmate at the jail for almost two years. (Doc.

14-20 at 72). She described him as quiet and told the jury that he never caused any problems. (Doc. 14-20 at 72).

John Crain, a special education teacher from New Jersey, testified that he knew Esposito when Esposito was in the seventh through ninth grades in school. (Doc. 14-21 at 84). He explained that Esposito came from a dysfunctional family, was emotionally disturbed, and was a follower. (Docs. 14-21 at 79-80, 84; 14-22 at 25-26). Crain described Esposito's mother, Debra,[16] as domineering and overly aggressive. (Doc. 14-21 at 80-81). Crain told the jury that Esposito's father was in prison for murder and his step-father was not involved in his life at all. (Doc. 14-21 at 79-80, 83-84). He explained that, on the first day of class, Esposito was attacked by fellow students because Esposito's biological father had murdered the father of one of the students in the class. (Doc. 14-21 at 79. He said that Esposito was not disruptive in class, always did what was expected, did not get into fights, and showed no outward aggression toward anyone at school. (Docs. 14-21 at 82; 14-22 at 3, 6, 9). Crain stated that Esposito made every effort to fit in at school, but was never able to do so. He explained that while Esposito eventually joined the wrestling team and became involved in weightlifting, he continued to search for an identity. (Doc. 14-21 at 82-83). Crain stated that the school was unable to meet Esposito's special needs,[17] in large part because Debra refused to

---

[16] In the record, Esposito's mother is referred to as Debra or Deborah Jean Esposito, Debra or Deborah Jean Deese, and Debra or Deborah Jean Trueax. This Order refers to her as Debra.

[17] According to Crain, Esposito needed to be placed in a classroom with fewer children, to attend

cooperate and blocked the school's efforts.[18]   (Doc. 14-21 at 83; 14-22 at 14).

Esposito's maternal aunt, Althea Holt, testified that Esposito's biological father physically abused both Esposito and Debra.   (Doc. 14-23 at 5).   After Debra left Esposito's biological father, she met Wayne Deese, who also verbally and physically abused both of them.   (Doc. 14-23 at 5).   Holt explained that Esposito was "beaten all of the time," and she personally saw the bruises and marks left on his arms.   (Doc. 14-23 at 5-6).   She asked Debra for custody of Esposito so she could take him out of the abusive environment.   However, Debra refused and then isolated Esposito from her.   (Doc. 14-23 at 5).

Holt described Esposito as quiet, shy, and respectful.   (Doc. 14-23 at 13).   She explained that after Esposito's father was incarcerated for murder, Esposito "was constantly reminded of the crime that his father had committed."   (Doc. 14-23 at 5). According to Holt, Esposito never had a father figure and was completely controlled by Debra, who would not allow him to have friends or play sports.   (Doc. 14-23 at 5, 12). Holt testified that Debra bathed Esposito until he was thirteen years old, and, during his later years, made him take three to four showers per day.   (Doc. 14-23 at 7).   Holt

---

counseling at least two hours per week, and to receive one-on-one tutoring.   (Doc. 14-22 at 14, 23).

[18] Not all that Crain revealed was helpful for Esposito.   On cross-examination he testified: Debra once had to obtain a restraining order against Esposito; Esposito's younger brother, who grew up in the same allegedly dysfunctional household, had never been in any trouble; Esposito had been in three different psychiatric hospitals; and, in 1994, Debra reported Esposito was involved in devil worship when he was in the seventh grade.   (Docs. 14-21 at 89-90; 14-22 at 21-22, 26).

explained that she last visited Esposito when he was eighteen years old and in the psychiatric ward of Underwood. (Doc. 14-23 at 6). She testified that she could not put into words the terrible life that Esposito was forced to endure and Debra, his father, and his stepfather all contributed to the fact that he was on trial for his life. (Doc. 14-23 at 14).

Annette Nolan, a registered psychiatric nurse, testified that in May 1996, Esposito was discharged from Underwood and admitted into Kennedy. (Doc. 14-23 at 16-17, 26). She explained that at the time, Esposito was depressed, suicidal, and had been in-and-out of mental institutions for years. (Doc. 14-23 at 17, 26). Nolan testified that Debra physically and sexually abused Esposito. (Doc. 14-23 at 19). She also told the jury that Esposito had been sexually molested by his step-father, Deese, and Deese's sister. (Doc. 14-23 at 19, 26). According to Nolan, Esposito loved Debra, but was disappointed and hurt that Debra exposed him to such abusive situations.

Nolan testified that Esposito "accepted Jesus Christ as his Lord and Savior" while he was a patient at Kennedy. (Doc. 14-23 at 20). She explained that she stayed in touch with Esposito after he was discharged and he had continued to attend church. (Doc. 14-23 at 21). According to Nolan, it was Esposito's association with Woodward that led to the murders. She opined that Esposito was just taking the blame while Woodward may have been the actual murderer. (Doc. 14-23 at 34, 36, 38-40). She asked the jury to "spare John the death penalty and give him life imprisonment." (Doc. 14-23 at 23).

On cross-examination, Nolan acknowledged that Esposito's discharge papers from Kennedy referred to him as "superficial, dramatic, and rather histrionic in his presentation as to what happened to him." (Doc. 14-23 at 25). She stated that she still believed what Esposito told her about the past sexual and physical abuse. (Doc. 14-23 at 26). She also acknowledged that Esposito was admitted into psychiatric hospitals on numerous occasions over a two year period but, upon discharge, never followed through with outpatient treatment, never attended group therapy, and never filled his prescriptions. (Doc. 14-23 at 30). She explained that such behavior is not unusual and that many mentally ill people fail to follow-up with their treatment because they are in denial about their mental illness. (Doc. 14-23 at 27-28).

Sister Marie DiCamillo, a special education teacher at Ancora, explained that Esposito was a patient at that facility for six months in 1994. (Doc. 14-23 at 44). She prepared Esposito to take his GED test and described Esposito as a model student, who was respectful and intelligent. (Doc. 14-23 at 46-48). When he passed his GED test, he was given a graduation ceremony at Ancora, which Debra refused to attend because she wanted "nothing to do with" Esposito. (Doc. 14-23 at 47). DiCamillo testified that Esposito was never accepted by his family. (Doc. 14-23 at 48). She described Esposito as a follower in need of guidance and explained that he did well in a structured environment. (Doc. 14-23 at 48). She asked the jury for mercy and requested that they

spare his life.[19]   (Doc. 14-23 at 49).

Angela Caraccillo, a therapist and program manager for the young adult program at TRIS, testified that 19 year-old Esposito was in their outpatient program while he was hospitalized at Ancora and spent one year in their residential program when he was discharged from Ancora in May 1995.[20]   (Doc. 14-23 at 58-59, 65, 78).   She explained that he entered the residential program because his mother would not allow him back into their home and he did not have the skills needed to live alone.   (Doc. 14-23 at 58-59).   According to Caraccillo, Esposito's mother had abandoned him when he was thirteen years old, did not want to have anything to do with him, refused to participate in therapy, and threatened to kill Esposito if she ever saw him again.   (Doc. 14-23 at 58-61).   She explained that Esposito was concerned that he did not fit in with others, was worried that he was not making anything of himself, never caused any problems, was polite and respectful, sought out therapy, and did well in vocational training. (Doc. 14-23 at 60-63, 78).   She testified that he experienced "dissociative" episodes, in

_____

[19] As with other sentencing phase witnesses, not all that DiCamillo said was helpful to Esposito. On cross-examination she acknowledged:   Esposito was admitted to Ancora because he was considered a threat to others; his admission screening documents showed that he wanted to kill everyone; he had homicidal ideations; and he did get into one physical altercation with a fellow patient.   (Doc. 14-23 at 50, 53).

[20] The jury heard that Esposito was hospitalized as follows:   (1) Underwood from April 12, 1994 until May 3, 1994; (2) Underwood from May 4, 1994 until May 10, 1994; (3) Kennedy from January 9, 1995 until January 18, 1995; (4) Underwood on January 26, 1995; (5) Underwood from February 25, 1995 until March 2, 1995; (6) Kennedy on March 2, 1995; (7) Ancora from March 3, 1995 until May 1, 1995; (8) TRIS on May 1, 1995 until the beginning of May 1996; and (9) Kennedy from May 3, 1996 until May 13, 1996   (Docs. 14-23 at 78-79, 84, 87; 14-24 at 4).   Esposito voluntarily admitted himself on all of these occasions except the April 12, 1994 hospitalization. (Doc. 14-24 at 2).

which he would "black[] out" and have no recollection of what had happened.   (Doc.

14-23 at 62).   She stated that he was in touch with reality only when he was in a

structured environment.   (Doc. 14-23 at 63, 82).

Caraccillo testified that Esposito had been physically abused by Debra and Deese,

as well as sexually abused by Deese and Deese's sister.   (Doc. 14-23 at 61).   She stated

that Esposito and his younger brother "cowered underneath the staircase hiding" every

day when Deese came home from work because they knew he would either sexually or

physically abuse them.   (Doc. 14-23 at 62-63).   She explained that Esposito had all of the

"concrete symptoms" of someone who had endured sexual abuse and, therefore, she did

not think he was lying or exaggerating.   (Doc. 14-24 at 3, 9).   She stated that, when

questioned, Esposito's mother admitted physically abusing him and never denied he

was sexually abused.   (Doc. 14-23 at 66; 14-24 at 9).   Instead of denying the abuse, his

mother simply explained that she "did not want to rehash old memories."   (Doc. 14-24

at 9).   Like DiCamillo, Caraccillo testified that she believed Woodward might have

actually committed the murders and Esposito was just protecting Woodward.   (Doc.

14-24 at 6-7).

On cross-examination, Caraccillo admitted Debra told her she would not

participate in Esposito's therapy because he had threatened to kill his family members,

had tortured animals,[21] and he displayed violent behavior.   (Doc. 14-23 at 66).   She

---

[21] Caraccillo testified that Esposito admitted being cruel to animals, but he was remorseful for

acknowledged that in April 1994 Debra sought a restraining order against Esposito

because he threatened family members. (Doc. 14-23 at 69-70). She also acknowledged

that in 1994, when he appeared before the court that issued the restraining order,

Esposito admitted he was involved in devil worship. (Doc. 14-23 at 70). She conceded

that he burned himself with cigarettes; cut himself with knives; and never held a job for

more than two weeks. (Doc. 14-23 at 72-73, 77-78). Caraccillo acknowledged that in

the discharge summary from his January 9, 1995 to January 18, 1995 hospitalization at

Kennedy, he admitted "lying repetitively" and that progress notes from his May 4, 1994

to May 10, 1994 stay at Underwood showed "that the likelihood of his compliance with

any form of outpatient treatment is consequently and significantly compromised by his

ongoing manipulation of the systems and resistance to treatment." (Doc. 14-23 at

84-85). However, she stated that she disagreed with these assessments because he was

compliant and cooperative while at TRIS. (Doc. 14-23 at 86).

    Grant, an expert in forensic psychology and neuropsychology, testified that he

reviewed Esposito's mental health records, interviewed Esposito, and administered "a

large number of tests"[22] to determine if Esposito suffered from any psychological,

_____

his actions. (Doc. 14-24 at 5-6).

[22] Grant testified that he administered the Wechsler Adult Intelligence Scale (third revision),
Kaufman Brief Intelligence Test, Visual Naming Test, Verbal Fluency Test, Nelson Denny
Reading Comprehension Test, Wide Range Achievement Test, Thurstone Test of Verbal Fluency,
Visual Discrimination Test, Line Orientation Test; Ray Complex Figure Test, Denman
Neuro-psychological Memory Scale, Wisconsin Card Sorting Test, Category Test, Rhythm Test,
Seashore Tonal Memory Test, Brief Test of Attention, Visual Test of Search and Attention, Finger

emotional, or behavioral problems.    (Doc. 14-24 at 19-20).    Grant explained that he

sought to determine if there were any deficits or problems with the way Esposito's brain

functions and if there were any "emotional [,] developmental and personality variables

that may have bearing on [Esposito's] behavior."    (Doc. 14-24 at 21).

Grant informed the jury:    (1) Esposito's attitudes about the world are simplistic,

naïve, and immature; (2) he is frequently absorbed in wishful thinking, daydreaming,

and fantasies; (3) he has excessive feelings of emptiness; (4) he suffers from identity

confusion, or confusion; (5) he needs other people to provide support, direction,

guidance, security, and structure for him; (6) he is passive, submissive, dependent, and

self-conscious; (7) he lacks any initiative, confidence, or self-sufficiency; (8) he is

incapable of making decisions and avoids doing so; (9) he has an excessive need for

someone to take care of him and is frequently helpless when left alone; (10) he has an

identity disturbance characterized by a markedly persistent unstable self-image; (11) he

is self-destructive, as shown by his previous five or six suicide attempts and various acts

of self-mutilation; (12) he seeks relationships and institutions to take care of him; (13) his

relationships are frequently unstable, intense, and volatile; (14) he is preoccupied with

constant fears of being abandoned, rejected, and alone; (15) he has dissociative episodes;

and (16) he does well in a structured environment, where his decisions are limited and

---

Tapping and Finger Tip Number Writing Tests, Million Clinical Multi-Axial Inventory (second version), Personality Assessment Inventory, Traumatic System Survey, Beck Hopelessness Scale, and Beck Scale for Suicide Ideation.    (Doc. 14-24 at 20-21).

where there are strict boundaries placed on him.   (Doc. 14-24 at 24-26, 36).   Grant

stated that he "would classify [Esposito] as falling within personality disorder, nos,[23]

and also having a lot of features of post-traumatic stress disorder."   (Doc. 14-24 at 38)

He testified that a personality disorder is considered "a severe debilitating disorder" and

suffering from one can be "devastating," and "extremely disruptive" to one's ability to

function in daily life.   (Doc. 14-24 at 38).

　　　Grant, like others, testified that Esposito has a long history of emotional, sexual,

and physical abuse.   (Doc. 14-24 at 26).   He explained that Deese beat Esposito with

various objects and forced him to perform oral sex on several occasions.   (Doc. 14-24 at

26).   Because of the abuse, Esposito suffers from recurrent intrusive thoughts and

nightmares and feels estranged and detached from others.   (Doc. 14-24 at 26).

　　　On cross-examination, Grant acknowledged that a Minnesota Multi-Phasic

Personality Inventory performed on Esposito in 1994 revealed he was rebellious, had

trouble with authority, had difficulty with social limits, had anti-social elements present,

and "people who score in a similar manner tend to be self-centered, narcissistic,

immature, impulsive, and emotionally superficial, and may have difficulty expressing

their hostility."   (Doc. 14-24 at 32).   Grant confirmed that Esposito's psychiatric records

show he is consistently found to be manipulative, superficial, and self-centered.   (Doc.

_____

[23] Grant explained that "nos" means "not otherwise specified" and a diagnosis of personality
disorder, nos, means that Esposito does not meet the criteria of one specific personality disorder,
such as anti-social personality disorder, but has aspects of several different personality
disorders, including anti-social personality disorder.   (Doc. 14-24 at 38).

14-24 at 34).   He stated that he agrees with Lower's findings that Esposito has average or above-average intelligence, is competent to stand trial, "is clinically responsible and understands the conduct of which he is accused and considers it wrong," and would not be considered mentally ill, as that term is defined in Georgia law.   (Doc. 14-24 at 42-44, 51).   While not fitting Georgia's legal definition for mentally ill, Grant explained that Esposito "has a mental illness under the … Diagnostic Statistical Manual of Mental Disorders, Fourth Edition," which is the "most widely used book in the world that diagnoses mental disorders."   (Doc. 14-24 at 44, 51).

Following this testimony, closing arguments, and the charge, it took the jury less than two hours to find the existence of three aggravating circumstances[24] and sentence Esposito to death.   (Docs. 13-6 at 7; 14-25 at 17-18).

3. Esposito's arguments

a. Trial counsel's alleged failure to investigate and present evidence of Esposito's abusive childhood and history of mental illness

Esposito alleges that trial counsel failed to investigate and present evidence to support their strategy that he had a difficult life history and some redeemable characteristics.   The state habeas court denied relief on this claim and the Georgia

_____

[24]  The jury found the following statutory aggravating circumstances existed:   (1) The offense of murder was committed while the offender was engaged in the commission of another capital felony, to wit:   armed robbery; (2) The offence of murder was committed while the offender was engaged in the commission of another capital felony, to wit:   kidnaping with bodily injury; and (3) the offense of murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind to the victim.   (Doc. 13-6 at 7).

Supreme Court concluded the claim had no arguable merit. (Docs. 27-39 at 21-30; 27-41 at 25-29, 34-36; 27-44). The record supports these decisions.

Esposito faults trial counsel for failing to present more witnesses who had personal knowledge of the abuse Esposito suffered as a child. At the state habeas evidentiary hearing, the only additional witness presented who had personal knowledge of Esposito's dysfunctional family life was his former girlfriend, Courtney Greco Veach. (Doc. 17-8 at 55). Esposito also introduced affidavits from friends, teachers, and family members who claimed to have knowledge of the abuse Esposito suffered at the hands of his mother, biological father, and step-father. (Docs. 17-20 at 75-77; 17-21 at 1-7, 75-77; 17-22 at 1-35).

It is well settled that "counsel is not required to present all mitigation evidence, even if additional mitigation evidence would have been compatible with counsel's strategy." *Putman*, 268 F.3d at 1244. "'The mere fact that other witnesses might have been available … is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (quoting *Foster v. Dugger*, 823 F.2d 402, 406 (11th Cir. 1987)). In relation to the affidavits[25] submitted to the state habeas court, the

---

[25] In his brief, Esposito makes much of Deese's affidavit. (Doc. 56 at 63-67). As explained above, Deese was Esposito's step-father and the person Esposito claims physically abused him and sexually molested him on numerous occasions when he was between the ages of three and ten. (Doc. 17-12 at 8; 18-14 at 22-23). In his affidavit, Deese makes no mention of any abuse he inflicted upon Esposito, but provides details about his tumultuous marriage to Debra, the physical and mental abuse Debra inflicted on Esposito, and Debra's promiscuous and sexually inappropriate behavior. (Docs. 17-21 at 75-77; 17-22 at 1-9; 56 at 63-67). The record shows

Eleventh Circuit has repeatedly explained:

> It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called, or, if they were called, had they been asked the right questions. This case is no exception. But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance. This case is no exception in that respect, either. That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel. As we have noted before, in retrospect, one may always identify shortcomings, but perfection is not the standard of effective assistance.

*Waters*, 46 F.3d at 1513-14 (quotation marks and citations omitted).

Esposito alleges that trial counsel were ineffective for failing for present Veach, his former girlfriend, as a witnesses during the mitigation phase of Esposito's trial. Veach arrived at the courthouse on the last day of Esposito's trial and, most likely, during the testimony of the last defense witness. (Doc. 17-8 at 89). Trial counsel told her they had no time to prepare her to testify so they were not going to call her. At the state habeas evidentiary hearing, Kelly explained that he would not have put Veach on

---

Deese told a different story when Guevara interviewed him prior to Esposito's trial. (Docs. 20-4 at 41-50). At that time, Deese claimed Debra was a "good mother, perfect" and she would do anything to protect her children. (Doc. 20-4 at 41) He told Guevara that Esposito was extremely violent, had threatened to kill him, and once stabbed him with a knife. (Doc. 20-4 at 46). Pretrial, Deese claimed that he was so afraid of Esposito, he "slept behind a locked door" and kept "a knife under the mattress." (Doc. 20-4 at 46). Following this interview, Guevara was informed that Deese did not want to be involved in Esposito's case and did not want to be contacted again. (Doc. 20-7 at 36) Given all of this, it was certainly reasonable for trial counsel to refrain from calling Deese.

the stand if he did not have time to prepare her beforehand. (Doc. 17-10 at 73). He also explained that the defense team planned for Grant to be the final mitigation witness and, therefore, their strategy could not accommodate Veach's late arrival. (Doc. 17-10 at 73). "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Waters*, 46 F.3d at 1512 (citing *Solomon v. Kemp*, 735 F.2d 395, 404 (11th Cir. 1984)). Certainly, the Georgia Supreme Court could have reasonably concluded that trial counsel did not perform deficiently by failing to call Veach.

At the state habeas evidentiary hearing, Veach testified that Esposito's mother was mentally and physically abusive; Esposito was frequently in mental hospitals; he was unable to keep a job or live independently; he had to rely on others to take care of him; and he engaged in self-mutilation. (Doc. 17-8 at 56-78). This testimony was largely cumulative of that presented at trial. Thus, it was also reasonable for the state court to determine that Esposito failed to show prejudice resulted from trial counsel's failure to call Veach as a mitigation witness. *Holsey v. Warden*, 694 F.3d 1230,1259-60 (11th Cir. 2012) (explaining that evidence is largely cumulative if it "tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury").

Esposito argues that trial counsel failed to present adequate evidence regarding his mental illnesses and hospitalizations. At the state habeas evidentiary hearing,

Esposito presented testimony from forensic psychologist, Dr. David Lisak. (Docs. 17-11 at 75-89; 17-12 at 1-65). Lisak testified regarding Esposito's "pathological" relationship with his abusive, hypersexual, controlling mother; his mental and emotional problems; his vulnerability; the sexual abuse Esposito suffered when he was young, his serious mental and emotional problems; Esposito's complete inability to function independently; and his need for a structured environment. (Docs. 17-11 at 75-89; 17-12 at 1-65; 56 at 73-77). However, Lisak had to acknowledge that all of this testimony was given by others during the sentencing phase of Esposito's trial. (Doc. 17-12 at 54-64).

Esposito faults trial counsel for failing to call Lower, the court-appointed psychologist who evaluated Esposito prior to trial. (Doc. 56 at 77). Lower assessed Esposito to determine competency to stand trial, degree of criminal responsibility or mental competence at the time of the murder, and whether he met the criteria for "mentally retarded" or "mentally ill" under O.C.G.A. § 17-7-131. (Doc. 17-14 at 13). Esposito alleges that Lower would have told the jury that he was a disturbed young man with a history of mental health problems that required multiple hospitalizations; he had a personality disorder characterized by poor judgment and impulse control; and he was mentally ill from a clinical standpoint. (Doc. 56 at 77-78).

Lower's findings are the same as the findings and testimony given by Grant during the sentencing phase of trial. Both Lower and Grant found that Esposito was competent to stand trial and was criminally responsible for his actions because he

understood the difference between right and wrong and knew the conduct of which he was accused was wrong. (Docs. 14-24 at 42-44, 51; 17-14 at 19). Both Lower and Grant found that Esposito was not mentally ill or mentally retarded under the legal definitions in O.C.G.A. § 17-7-131. (Docs. 14-24 at 37, 44; 17-14 at 19). Just as Lower testified in the state habeas evidentiary hearing, Grant told that jury that while not "legally" mentally ill, Esposito was clinically mentally ill. (Docs. 14-24 at 44, 51). Lower's ultimate diagnosis, personality disorder, nos, was the same as Grant's. (Docs. 14-24 at 37-39, 43; 17-14 at 23).

In short, it was reasonable for the state courts to conclude that trial counsel reasonably investigated Esposito's mental health, reasonably presented evidence regarding his mental health issues, and Esposito was not prejudiced by trial counsel's failure to offer different witnesses or more testimony regarding his mental illnesses. Thus, relief must be denied on this claim.

Citing *Williams v. Taylor*, 529 U.S. 362 (2000), Esposito claims that the state habeas court unreasonably discounted or failed to adequately evaluate the totality of available mitigating evidence. (Doc. 56 at 87). As discussed above, the relevant order for purposes of AEDPA review is the Georgia Supreme Court's summary denial of Esposito's CPC application. *Hittson*, 759 at 1231-32. Therefore, the Butts County Superior Court's analysis is irrelevant. However, assuming that the superior court's reasoning is relevant, there is no indication that the court unreasonably discounted or

inadequately evaluated Esposito's mitigation evidence. The state habeas court was under no duty to list every piece of evidence Esposito thought relevant to his ineffective assistance claims. As the Supreme Court explained, a state court is not required to "show its work" or provide rationales and explanations for its decisions. *Richter*, 131 S. Ct. at 784. Instead, the focus is on the ultimate legal conclusion reached by the state court, "'not on whether the state court considered and discussed every angle of the evidence.'" *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1211 (11th Cir. 2013) (quoting *Gill v. Mecusker*, 633 F.3d 1272, 1290 (11th Cir. 2011)). Unless there was a conspicuous misapplication of federal law, which there was not, this Court must assume the state court knew and followed the law. *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1329-30 (11th Cir. 2013).

    b. <u>Trial counsel's alleged failure to investigate and present evidence of Woodward's domineering and violent personality</u>

Trial counsel testified that they thought Woodward was the "brains of this group" and Esposito was "the follower … doing as she wanted him to do." (Doc. 17-10 at 39). They asked Guevara to interview Woodward's friends and family in order to obtain information about her background. (Doc. 17-10 at 70). Guevara made multiple attempts to interview Woodward's friends, former employers, and former roommates. (Docs. 20-1 at 83; 20-2 at 24-26; 20-4 at 57). While he did interview some former employers and acquaintances, several persons could not be located and others refused to speak with him. (Docs. 19-22 at 14; 20-4 at 57; 20-6 at 11, 28-29, 47-48, 63-64). Trial

counsel obtained letters from Woodward to former cellmates and from former cellmates to Woodward.   (Doc. 20-1 at 23).

During both the guilt and sentencing phases of trial, trial counsel sought to establish that Woodward manipulated and controlled Esposito.   (Docs 17-10 at 43-44; 17-11 at 15).   Through various guilt phase State witnesses, trial counsel showed that Woodward was the one who rented all of the hotel rooms during their travels (Docs. 14-7 at 11; 14-11 at 26); she purchased the bus tickets (Doc. 14-17 at 19); she always drove (Doc. 14-8 at 41, 43); she weighed more than Esposito[26]   (Docs. 14-7 at 59, 66; 14-10 at 1, 5); and she was the one who actually approached Mrs. Davis (Docs. 14-7 at 90; 14-8 at 3, 4). During the sentencing phase, witnesses testified that Esposito was a passive follower who was incapable of making decisions on his own and unable to function independently in the world.   (Docs. 14-21 at 79-20; 14-24 at 24-26, 36).   Witnesses testified that they thought it possible Woodward committed the murders and Esposito confessed just to protect her.   (Docs 14-23 at 34, 36, 38, 40; 14-24 at 6-7).   Trial counsel hoped that all of this testimony would show Woodward was the main actor and more

_____

[26] Esposito also argues that trial counsel were ineffective for failing to call Woodward as an exhibit so the jury could see she was a "large and imposing" figure who had the "ability to dominate Mr. Esposito and the physical prowess to commit the murders."   (Doc. 56 at 48). Both Esposito and Woodward were 5' 7" tall.   (Doc. 17-11 at 49).   He weighed 160 pounds and had a muscular build.   (Doc. 17-11 at 49).   She weighed 180 pounds.   (Doc. 17-11 at 49).   Some witnesses described Woodward as an attractive woman with long dark hair.   (Docs. 14-7 at 85; 14-8 at 41).   Trial counsel testified that they did not call Woodward because they did not think she could add anything beneficial to their case.   (Docs. 14-7 at 85; 14-8 at 41; 17-11 at 51-52). This was a reasonable strategic decision.   *See Waters*, 46 F.3d at 1512 (explaining that which witnesses to call "is the epitome of a strategic decision" that should seldom be second guessed by the courts).

culpable that Esposito.   (Doc. 17-11 at 18).

Esposito faults trial counsel for failing to call witnesses who could have testified regarding Woodward's domineering personality and violent behavior.   At the state habeas evidentiary hearing, Esposito introduced five affidavits from people who described Woodward as possessive, physically abusive, violent, unstable, unpredictable, and irrational.   (Docs. 17-22 at 28-31; 18-9 at 66-69, 71-79, 81-85).   Affiant Heather Bryan claimed that Woodward once attacked her with a knife and that Woodward physically assaulted her own mother, who suffered from multiple sclerosis.[27]   (Doc. 18-9 at 66-69). Previous boyfriends stated that Woodward stalked them, forced herself on them, and became violent when they ended the relationships.   (Doc. 18-9 at 75-79, 81-85)   Only one of the five affiants, Patricia Holliman, had any knowledge of Woodward's relationship with Esposito.   She described Esposito as a model tenant during the few months he lived in her boarding house in 1996 and stated that he did not want to accompany Woodward to North Carolina, but she was incredibly persistent and he finally relented.   (Doc. 17-22 at 2831).[28]

The state court found meritless Esposito's claim that his trial counsel were ineffective for failing to investigate and present evidence to support their theory that

---

[27]  This is in stark contrast to the pretrial information Bryan provided to the GBI on September 23, 1996.   At that time, she told Special Agent Ron Braxley that she had "never known [Woodward] to be violent."   (Doc. 18-9 at 70).

[28]  Holliman explained that she was interviewed by Guevara prior to Esposito's trial.   She does not indicate what she told Guevara at the time.   (Doc. 17-22 at 31).

Woodward was more culpable than Esposito.   This decision did not involve an unreasonable application of *Strickland*, nor was it based on unreasonable factual findings.   Testimony such as that in the affidavits tendered at the state habeas evidentiary hearing "could have supported [Esposito's] mitigation theory during the penalty phase; however, [they] are not the silver bullet that [Esposito] tries to make [them] out to be."   *Hittson*, 759 F.3d at 1253 (citing *Strickler v. Greene*, 527 U.S. 263, 289 (1999).   The jury could have heard all these witnesses had to say about Woodward and still concluded that Esposito was responsible for Mrs. Davis' murder.   After all, Esposito confessed to bludgeoning her and the Sniders.   This court cannot say that Esposito has shown a reasonable probability that the result of his trial would have been different had these witnesses testified regarding Woodward.   Certainly, this Court cannot find that "no fairminded jurist could agree with the state court's" denial of relief. *Holsey*, 694 F.3d at 1257 (quotation marks and citations omitted).

> c. Trial counsel's alleged failure to investigate and present evidence that the physical evidence was inconsistent with Esposito's confession

Esposito claims that trial counsel were ineffective for failing to retain a forensic pathologist who could have testified that Mrs. Davis' injuries were inconsistent with injuries caused by a tree limb and that whatever instrument caused her injuries should have had transfer biological material, such as blood, on it.   (Doc. 56 at 42-43).   He also

claims that trial counsel should have had their DNA expert examine the tree limb[29] that was found at the crime scene so she could have told the jury there was no blood on the limb.   According to Esposito, such testimony would have been compelling evidence that Esposito was less culpable than Woodward and that he was untruthful when he confessed to killing Mrs. Davis.   (Doc. 56 at 43).

As for trial counsel's performance, the record shows they consulted DNA expert, Dr. Linda Adkinson.   (Doc. 17-10 at 73).   Kelly testified that he "didn't get real good vibrations about her testifying" but he wanted her to assist him in cross-examining the State's DNA expert.   (Doc. 17-10 at 74).   Kelly explained that "since [the State] didn't try to take DNA from the limb, that was one of the things that we were trying to bring out, that there was nothing to put [Esposito] as the actual person who did the killing, other than the confession[]."   (Doc. 17-10 at 74).

When cross-examining the State's experts, trial counsel established that whoever lifted the limb to hit Mrs. Davis may have left skin on the limb, but the State had not performed any DNA testing of the limb.   (Docs. 14-13 at 3; 14-14 at 13-14, 29).   During his closing argument, Kelly stressed the brutal beating should have left the victim's blood and the perpetrator's skin on the murder weapon.   (Doc. 14-6 at 25).   Yet, there

---

[29] Actually two limbs or pieces of wood are referenced in the trial transcript.   One was a larger limb that was on top of Mrs. Davis' body at the crime scene.   (Docs. 14-9 at 16-18; 15-4 at 9).   The other was a smaller "tree branch piece" or a "piece of cast-off tree limb" that was located near her body.   (Docs. 14-9 at 18; 15-4 at 10).   The latter apparently came from the larger limb.   (Doc. 14-9 at 58-61).

was no blood on the tree limb or the limb had not been tested for blood.   (Doc. 14-16 at

25).   As for any skin that might have been left by the perpetrator, Kelly argued:

> All it takes is half a microgram of skin and you could tell who held that
> limb.    It brings me to the obvious question that I've been asking myself for
> a long time, until the time this case started.    Why didn't they test the
> things that were at the crime … scene?    Why didn't they run [a] DNA test
> on them?    We have heard so much about DNA the last few months we are
> probably sick of it, but it's a very legitimate question, especially on an
> object that the State says killed a person.    Would not that be the first thing
> you tested?    Not the first DNA test.    Why not….    Why did they want to
> go to all this trouble to try to prove it.    They've got this statement.    Why
> do they want to go through all this trouble to test this limb.    And that's the
> whole theory that they've got.    We've got this statement, so, you know,
> let's … pick out something and let's don't test anything else….    [M]y
> client is charged with murder.    It's not some traffic ticket….    And you
> know what the stakes are.    And you know who has the burden.    Should
> you, could you leave any stone unturned when you are trying to convict
> someone of murder….    [I]t doesn't take a rocket scientist to say the first
> thing that out to be tested … is that limb.    They got some hairs from Mrs.
> Davis, but there is nothing on that limb that puts John Esposito with it, or
> at that crime scene, nothing.

(Doc. 14-16 at 26-27).

The Georgia Supreme Court had ample support for finding trial counsel's

performance reasonable.   It appears that trial counsel was not focused on trying to

establish that the limb was not the murder weapon.   Instead, they focused on the State's

failure to test the limb to determine who had lifted it to hit Mrs. Davis.   This makes

sense because the presence of Mrs. Davis's hair embedded in the limb tended to establish

that she had been struck by the limb.   The State's microanalyst testified that sixty-three

hairs found on the cast-off piece of limb matched hairs on Mrs. Davis' head, as did five

strands of hair embedded in the larger tree limb.[30]    (Doc. 14-14 at 21-26).

To show he was prejudiced by trial counsel's failure to retain a forensic pathologist to testify that Mrs. Davis' injuries were not caused by a limb, Esposito presented testimony from forensic pathologist Dr. Jonathan Arden at the state habeas evidentiary hearing.    (Doc. 17-9 at 30-42).    Arden testified that, based on his review of autopsy photographs,[31] Mrs. Davis' injuries were caused by two or three different man-made object, but he could not say with reasonable certainty what objects caused any of the injuries.    (Doc. 17-9 at 27, 30-34, 41).    On cross-examination, Arden acknowledged that some of Mrs. Davis' injuries could have been caused by the tread of an athletic shoe, which is consistent with one of Esposito's statement.    (Doc. 17-9 at 61, 63-64).    More importantly, Arden conceded that Mrs. Davis' hairs were found embedded in the tree limbs.    (Doc. 17-9 at 71).    Given this, he had to acknowledge that it was possible she was struck by the limb.    (Doc. 17-9 at 71-72).

---

[30] A forensic report dated November 14, 1996 shows "CHEMICAL EXAMINATION OF THE TREE LIMB (ITEM 1) FAILS TO REVEAL THE PRESENCE OF BLOOD."    (Doc. 19-11 at 78). Esposito faults trial counsel for failing to introduce the report at trial or question the forensic serologist about the report.    (Doc. 56 at 44 n.31).    The record does not reveal why trial counsel did not introduce the report or question the forensic serologist.    Again, it appears that trial counsel were not focused on trying to establish the limb was not the murder weapon.    Instead, they were focused on the lack of physical evidence linking Esposito to the limb and the State's failure to test the limb to confirm Esposito's confession that he (not Woodward) was the one who used the limb to kill Mrs. Davis.    (Doc. 14-16 at 25-27).    This was reasonable because the State never maintained there was blood on the limb and Davis' hair, not blood, supported the State's argument that the limb was used to bludgeon Davis.    (Doc. 14-14 at 21-27).

[31] Arden had not spoken with the medical examiner or any investigator involved in Mrs. Davis' case.    Nor had he actually seen the tree limb.    He only saw photographs, in which the tree limb was wrapped in plastic.    He had not even seen any close-up photographs of the unwrapped tree limb and its bark.    (Doc. 17-9 at 57-58).

Looking at the entire record, the state courts reasonably found Esposito had not

shown prejudice.   He did not show a reasonable probability that the result of his trial

would have been different if his DNA expert testified there was no blood on the tree

limb, or the forensic report showing the lack of blood had been introduced into evidence,

or had trial counsel hired a forensic pathologist, such as Arden, to testify.

    d.   <u>Trial counsel's failure to object to the prosecutor's questioning of Grant and the allegedly improper characterization of mental health evidence during closing</u>

Esposito argues trial counsel should have objected to the prosecutor's

cross-examination of Grant and closing argument, both of which Esposito claims

"prevented the jury from giving meaningful effect" to his mental health evidence.

(Doc. 56 at 98-105).   Respondent argues the claim is unexhausted, or if exhausted, it is

meritless.   (Doc. 57 at 98-100).

Looking first at exhaustion, in his amended state habeas petition, Esposito alleged

the "prosecution attempted to remove from the jury's consideration Petitioner's history

of mental illness" and "[t]o the extent that Petitioner's counsel failed to object … [they

were] ineffective, and Petitioner was prejudiced thereby."[32]   (Doc. 17-2 at 14-15 n.4).

Additionally, in his post-hearing brief, Esposito argued that the prosecution's

questioning of Grant was "improper in its own right … and defense counsel should have

---

[32] Esposito raised the prosecutorial misconduct claim in the body of his amended state habeas petition and raised the ineffective assistance of counsel claim in a footnote.   (Doc. 17-2 at 14-15 n.4).

vigorously objected." (Doc. 27-34 at 28). He complained that "[t]rial counsel failed to object to this improper questioning and stood silently by while the State mischaracterized Dr. Grant's professional opinions…." (Doc. 27-34 at 30). The state habeas court did not specifically address this ineffective assistance claim, but the court's order contained a "catch-all" provision that provided: "As to any other claims of ineffective assistance of counsel not specifically addressed in this Order, this Court finds that Petitioner failed to meet his burden under *Strickland* of proving deficient performance and actual prejudice." (Doc. 27-39 at 44).

Any claim that is not contained within a Georgia habeas petitioner's CPC application is unexhausted. *Hittson*, 759 F.3d at 1232 n.23. In section IV(G) of his CPC application, Esposito argued the State misled the jury into believing that his mental health problems did not qualify as mitigation. (Doc. 27-41 at 52). In a footnote in the introduction of section IV, Esposito stated, "This Court cannot ignore the State's improper actions merely because Mr. Esposito's counsel were ineffective for failing to properly object and litigate them…. In addition, Mr. Esposito's attorneys were ineffective for failing to challenge the improper arguments and actions of the State that are discussed herein." (Doc. 27-41 at 44 n.17). The Georgia Supreme Court denied Esposito's CPC application.

While it is certainly debatable whether Esposito adequately presented this ineffective assistance claim to the state courts, the Court finds Esposito exhausted the

claim.   The Court, however, agrees with Respondent that the claim has no merit.   The

Eleventh Circuit recently explained:

> When a petitioner says his attorney was ineffective for failing to make an objection, *Strickland* requires proof that the attorney fell below the standard of reasonableness under prevailing norms.   This test has nothing to do with what the best lawyers would have done.   Nor is the test even what most good lawyers would have done.   We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted.

> Decisions about whether to object—and when, and in what form—are tactical choices consigned by *Strickland* to a lawyer's reasoned professional judgment.   Good lawyers, knowing that judges and juries have limited patience, serve their clients best when they are judicious in making objections.   In any trial, a lawyer will leave some objections on the table. Some of those objections might even be meritorious, but the competent lawyer nonetheless leaves them unmade because he considers them distractive or incompatible with his trial strategy.

*Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1295 (11th Cir. 2014) (quotation marks and

citations omitted)..

Looking at the circumstances in this case, trial counsel stated that they called

Grant to testify about Esposito's difficult childhood, his physical and sexual abuse, and

his traumatic experiences.   (Doc. 17-10 at 72).   Grant provided this testimony during

his direct examination.   (Doc. 14-14 at 24-26, 36).   During cross-examination, Grant

testified that Esposito suffers from borderline personality, nos, which can be a severe,

life-long, debilitating disorder.   (Doc. 14-24 at 38, 43).   The prosecutor asked if Esposito

was mentally retarded and Grant stated he was not.   (Doc. 14-24 at 35).   The prosecutor

asked if, "[d]espite the personality disorder," is Esposito mentally ill under Georgia law

at O.C.G.A. § 17-7-131. (Doc. 14-24 at 44). Grant responded, "[n]o, he doesn't necessarily fit that definition, but he does fit the definition of a mental disorder based on the diagnostic and psychotic manual of mental disorders." (Doc. 14-24 at 44). The exchange continued:

> Q. And is he mentally ill under the definition of the law?
> A. He's not mentally ill according to what you said, but he has a mental illness under the – the Diagnostic Statistical Manual of Mental Disorders, Fourth Edition.
> Q. So, the answer is "no."
> A. It's "no" but—it depends on which—
> Q. Under the legal definition the answer is "no."
> A. No not under that definition, but this is the most widely used book in the world that diagnoses mental disorders and he does meet them.
> Q. Which book are we using today, sir?
> A. You're asking about that one.
> Q. Thank you.

(Doc. 14-24 at 51).

Esposito argues that trial counsel should have objected because O.C.G.A. § 17-7-131 has nothing to do with the definition of relevant mitigating evidence in the sentencing phase of a capital crime. Instead, "[i]t includes a definition of the term 'mentally ill' for purposes of the legal determination whether a criminal defendant is 'guilty but mentally ill at the time of the crime.'" (Doc. 56 at 103) (citing O.C.G.A. § 17-7-131(a)(2)). Without support, Esposito argues that trial counsel did not object because they did not know the law. (Doc. 56 at 105). The record does not reveal why trial counsel failed to object. It could be that trial counsel did not want to emphasize Grant's "personality disorder, nos" diagnosis because, according to Grant, it included

aspects of borderline personality disorder, narcissistic personality disorder, and anti-social personality disorder. (Doc. 14-24 at 38). Such diagnoses can be seen damaging as opposed to mitigating. *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1368 (11th Cir. 2009). Regardless, even if counsel performed ineffectively by failing to object, the Georgia Supreme Court had a reasonable basis for concluding Esposito was not prejudiced.

Contrary to Esposito's assertion, it is not apparent that "[w]hat little mitigating evidence the jury heard was likely not considered." (Doc. 56 at 98). The jury heard from numerous witnesses, including Grant, that Esposito had longstanding psychological problems, was emotionally disturbed, suicidal, depressed, and had been in-and-out- of mental institutions for years. (Docs. 14-21 at 79-80, 84; 14-22 at 25-26; 14-23 at 17, 26). Grant repeatedly expressed that Esposito was mentally ill from a clinical standpoint. Contrary to Esposito's assertions, trial counsel's failure to object did not "allow[] the prosecution to argue that Mr. Esposito's history of psychiatric illness had no mitigating value." (Doc. 56 at 98). In fact, the State never argued that Esposito's mental health problems could be considered mitigating only if they rose to the level of "mentally ill" under Georgia law.

Esposito claims that the prosecutor exploited the improper cross-examination when, during his closing argument, he stressed that the jury was to be guided by the law in determining Esposito's sentence and observed: "Statutory means it's set out in our

statutes. It's in one of those black law books that Ms. Baskin held up. Those are our law books and this is a court of law." (Doc. 14-24 at 65-66). A review of the record reveals that the prosecutor was not underscoring the importance of Grant's cross-examination or talking about mitigating circumstances at all. Instead, he was telling the jury that before they could impose the death penalty, they had to find at least one "statutory aggravating circumstance." (Doc. 14-24 at 65-66). He told the jury that "statutory" means "it's set out in our statutes" in the "law books." (Doc. 14-24 at 65-66).

In their closing, trial counsel argued that Esposito's "problems" did not excuse his actions, but they were "a factor in mitigation." (Doc. 14-25 at 2). The trial court instructed the jury to consider all mitigating circumstances, which it defined as "those which you … find do not constitute a justification or excuse for the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability or blame." (Doc. 14-25 at 6).

There is no indication the jury failed to consider any of Esposito's potentially mitigating evidence. Moreover, given the brutality of Esposito's crimes, he has not shown a reasonable probability that the outcome of his sentencing proceeding would have been different but for trial counsel's failure to object to the prosecutor's cross-examination of Grant and closing.[33] Certainly, he has not shown "there was no

---

[33] Esposito can show prejudice resulting from trial counsel's failure to object to the prosecutor's closing only if the underlying improper prosecutorial argument claim would warrant relief; which would be the case only if there was a reasonable probability that the improper argument

reasonable basis for the state court to deny relief." *Hittson*, 759 F.3d at 1233.

    e. <u>Trial counsel's failure to object to the prosecutor's allegedly improper examination of additional witnesses</u>

Esposito makes three arguments: (1) Trial counsel should have objected to the prosecutor's improper questioning of sentencing phase witnesses John Crain,[34] Alicia Holt,[35] and Annette Nolan;[36] (2) trial counsel should have objected when the prosecutor allegedly "made several comments that served to bolster the credibility of his witnesses and imply that he knew the witnesses to be sincere and trustworthy;[37] and (3) trial counsel should have objected to victim impact evidence presented in the guilt phase of the trial through witnesses George McNeill and Helena Herring[38] and during the

---

changed the outcome of the case. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Esposito has not shown that absent any improper prosecutorial argument, he would not have received a death sentence.

[34] Esposito claims that when cross-examining Crain, the prosecutor insinuated Esposito was a racist, improperly questioned Crain about Esposito's involvement in devil worship, and improperly engaged Crain in a discussion of the ties Esposito's father had to the Italian mob. (Doc. 56 at 106).

[35] Esposito claims that the prosecutor improperly questioned Holt regarding Esposito's involvement in devil worship. (Doc. 56 at 108).

[36] During direct examination, Nolan testified that Esposito was a born-again Christian. On cross-examination the prosecutor asked her if she would be surprised to hear that Esposito did not give Mrs. Davis or the Sniders a chance to pray before he beat them to death. (Doc. 56 at 108).

[37] Specifically, Esposito argues that trial counsel were ineffective for failing to object when the prosecutor referred to Alvin Schmidt as a "genuine Texas Ranger" and repeated Schmidt's answers to several questions. (Doc. 56 at 110). He also argues that counsel should have objected when the prosecutor had Knight repeat several of his answers. (Doc. 56 at 110-11)

[38] Esposito argues that trial counsel should have objected when the prosecutor elicited testimony from McNeill and Herring regarding: The poor health of Mr. Davis; the sacrifices Mrs. Davis made to care for her husband; Mrs. Davis' compassionate, caring nature; her church attendance; her good health; her love of gardening; and the affection she had for her dog and the children in her neighborhood. (Doc. 56 at 115-16).

sentencing phase of the trial through Lawrence Snider, Jr. and Shirley Snider.[39]   (Doc. 56 at 106-08, 110, 113).

Respondent argues these ineffective assistance claims are unexhausted or, alternatively, they have no merit.

Looking first at exhaustion, in his amended state habeas petition, Esposito made these general allegations:   "Counsel failed to object to the admission of several items of evidence and testimony offered by the State during the guilt/innocence and sentencing phases of trial"; "[c]ounsel failed to object to or otherwise litigate the improper admission of extensive irrelevant and prejudicial evidence regarding the victims"; "[c]ounsel failed to adequately object to and litigate improper testimony, including, but not limited to, testimony that was hearsay, irrelevant, cumulative, outside the personal knowledge of the witness, and testimony that was highly prejudicial"; and "[c]ounsel failed to object to improper comments and arguments by the prosecution within which the prosecution vouched for the credibility of prosecution witnesses."   (Doc. 17-2 at 5-9).

In his post-hearing brief, Esposito argued that the State improperly vouched for the credibility of prosecution witnesses and, during the guilt phase of trial, improperly

---

[39] Esposito argues trial counsel should have objected when Lawrence Snider testified his parents had been married over 62 years at the time of their deaths and they attended church every Sunday.   Also, he claims that trial counsel should have objected when Shirley Snider testified her in-laws treated her like a daughter, were caring, active, loving, and very involved with their church.   (Doc. 56 at 118-19).

elicited testimony about Mrs. Davis' habits, life, and personality.   (Docs. 27-34 at 78-84; 28-1 at 1, 5-7).   Regarding trial counsel's response, or lack thereof, Esposito's only relevant claim was that trial counsel were ineffective for failing to ensure the jury did not base its decisions on emotion or passion.   (Doc. 27-34 at 77).[40]

In his CPC application, Esposito alleged that "[d]uring the guilt/innocence phase of the trial, the State elicited extensive testimony about the victim that was irrelevant and served only to inflame the jury's emotions."   (Doc. 27-41 at 45).   He also complained that the State improperly vouched for the credibility of its witnesses.   (Doc. 27-41 at 49-50).   Finally, Esposito alleged generally that trial counsel "were ineffective for failing to challenge the improper arguments and actions of the State."   (Doc. 27-41 at 44 n.17).

Given this record, Esposito arguably exhausted his claims that trial counsel were ineffective when they failed to object to the guilt phase victim impact testimony and when they failed to object when the prosecutor vouched for the credibility of his witnesses.   It does not appear Esposito exhausted his claims that trial counsel were ineffective when they did not object to the prosecutor's allegedly improper questioning of sentencing phase witnesses Crain, Holt, Nolan, Lawrence Snider, and Shirley Snider.

However, the Court agrees with Respondent, even if all claims are exhausted, they are without merit.   Assuming the failure to object was deficient, Esposito has not

_____

[40] While the state habeas court did not specifically address this claim, it did state, "[a]s to any other claims of ineffective assistance of counsel not specifically addressed in this Order, this Court finds that [Esposito] failed to meet his burden under Strickland of proving deficient performance and actual prejudice."   (Doc. 27-39 at 44).

established prejudice. Esposito has not shown a reasonable probability that had trial counsel objected to the questioning of, or testimony given by, any of the witnesses, there is a reasonable probability that the outcome of the guilt phase of his trial would have been any different. Witnesses placed Esposito in the car with Mrs. Davis in Lumberton, North Carolina and fingerprints, palm prints, footprints and DNA from a cigarette butt taken from Mrs. Davis' Buick all matched Esposito. *Esposito*, 273 Ga. at 183, 538 S.E.2d at 57. Not to mention that in his detailed statement to Knight, Esposito explained how he bludgeoned Mrs. Davis to death. Given this evidence, his guilt was not at issue. In relation to his sentence, Esposito has not shown a reasonable probability that had trial counsel successfully objected to the prosecutor's questions, the jury would not have imposed the death penalty. Given the extensive nonstatutory evidence in aggravation offered during sentencing—specifically the brutal murder of the Sniders—it was reasonable for the state courts to conclude that Esposito could not show prejudice. *See Clisby v. Alabama*, 26 F.3d 1054, 1057 (11th Cir. 1994) ("*Strickland* and several other cases reflect the reality of death penalty litigation: sometimes the best lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder.").

      f.   <u>Trial counsel's failure to object to the presentation of the Texas crime scene videotape introduced during sentencing</u>

Prior to the sentencing phase of Esposito's trial, trial counsel objected to the admission of evidence related to the Sniders' murder. (Doc. 14-16 at 80). The

prosecutor argued that the evidence related to Esposito's character and was, therefore, admissible in sentencing. (Doc. 14-16 at 80-81). The trial court agreed with the prosecutor and found the "State has a right to present this evidence." (Doc. 14-16 at 81). Part of that evidence was a videotape depicting the crime scene, including the Sniders' bodies.[41] (Doc. 56 at 131). Trial counsel did not specifically object to the presentation of the crime scene video. Instead all parties agreed that the video would be played without audio and they agreed on a particular stopping point.[42] (Doc. 14-20 at 5-6).

During his state habeas proceedings, Esposito argued that trial counsel were ineffective for failing to contest the admission of the videotape. (Doc. 27-34 at 60-66). The state habeas court addressed Esposito's specific allegation regarding the videotape in the context of his broader claim that trial counsel were deficient in their attempts to suppress harmful evidence offered by the State and found trial counsel performed reasonably. (Doc. 27-39 at 37-39). Esposito argues that the state habeas court's finding that "Mr. Kelly and Mr. Roberts 'reasonably and zealously tried to keep out evidence of Petitioner's confessions and the Sniders' murder" was an unreasonable factual finding. He also claims that the state habeas court's conclusion that trial counsel's performance was reasonable involved in unreasonable application of *Strickland*. (Docs. 27-39 at 38;

---

[41] The DVD containing the videotape of the Oldham County, Texas crime scene has been manually filed and is the record as Respondent's Exhibit 168.

[42] The prosecutor stated that "we have agreed to play it and stop at a certain point. There's a scene at the morgue afterwards, and we're going to agree not to play that." (Doc. 14-20 at 5). Trial counsel complained that the audio was "not appropriate" and the prosecutor stated, "[t]here will be no audio." (Doc. 14-20 at 6).

56 at 130-33).

Under *Hittson*, the state habeas court's findings and reasoning are irrelevant. Instead, the Georgia Supreme Court's summary denial of Esposito's CPC application, in which he raised this claim, is the relevant decision and the only question is "whether the Georgia Supreme Court had any reasonable basis" to conclude that Esposito's ineffective-assistance claim was meritless. *Hittson*, 759 F.3d at 1273 (Carnes, J., concurring). It did. Had trial counsel objected, there was not a reasonable likelihood of a different result. Georgia courts have routinely held graphic, inflammatory photographs and videotapes admissible despite their gruesome and prejudicial nature. *See Crozier v. State*, 263 Ga. 866, 867, 440 S.E.2d 635, 636 (1994) (addressing admission of photographs and explaining that admission of evidence is favored in doubtful cases and photos depicting the nature and location of victim's wounds were relevant and admissible even if they were duplicative and inflammatory); *Joyner v. State*, 280 Ga. 37, 40, 622 S.E.2d 319, 323 (2005) (addressing videotape and explaining that the trial court properly admitted video although trial counsel objected on the grounds that its depiction of the victim's decomposed body was inflammatory and lacked evidentiary value); *Bullard v. State*, 263 Ga. 682, 686, 436 S.3d.2d 647, 651 (1993) (explaining the gruesome nature of the videotape complained of resulted entirely from the acts of the defendant, not from any alteration or autopsy by the state and, therefore, tape properly admitted). Also, even if trial counsel had objected and the video had been excluded,

there was not a reasonable probability that the jury would have reached a different sentencing verdict. Esposito confessed to kidnapping these elderly people, robbing them, forcing them to endure hours travelling in the car with him and his codefendant, and finally beating each of them to death. It was reasonable for the Georgia Supreme Court to find a lack of prejudice.

Furthermore, assuming the state habeas court's decision is relevant, it was not based on any unreasonable factual findings and did not involve an unreasonable application of *Strickland*. When the state habeas court found trial counsel acted "reasonably and zealously" in trying to suppress harmful evidence, it was not referring solely to trial counsel's efforts to keep out evidence of the Sniders' murder. (Doc. 27-39 at 38). Instead, the state habeas court's order clearly shows the court was referring to efforts trial counsel made to exclude evidence of Esposito's "confessions **and** the Sniders' murder." (Doc. 27-39 at 38) (emphasis added). While trial counsel made only a verbal objection to admission of evidence related to the Sniders' murder, they did more in their attempts to have his confessions suppressed. In addition to filing a motion to suppress, they filed an *ex parte* motion for funds to bring in out-of-state witnesses, presented witnesses and arguments at the lengthy hearing, and were ultimately successful in keeping Esposito's videotaped confession out of evidence. (Docs. 13-5 at 29-38, 44-46, 77; 13-11 at 1-89; 13-12 at 1-89; 13-13 at 1-64). Thus, the state habeas court's characterization of trial counsel's performance regarding their efforts to suppress

evidence of Esposito's "confessions **and** the Sniders' murder" was reasonable and the court's denial of relief did not constitute an unreasonable application of *Strickland*. (Doc. 27-39 at 38) (emphasis added). Certainly the state habeas court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87. Thus, the Court must deny relief on this claim.

g. <u>Trial counsel's failure to object to the jury's visit to the crime scene</u>

During the guilt phase of Esposito's trial, the jury visited the crime scene in the company of Chief Deputy Michael Pritchett, who was a witness for the State and one of the first officers to arrive at the scene. (Doc. 56 at 133-41). The trial judge, court reporter, prosecutor, and trial counsel did not attend this visit. Esposito claims trial counsel were ineffective for agreeing to the crime scene visit. (Doc. 56 at 133-41).

The record shows the trial judge instructed the jury that they were going to be taken by bus to the crime scene and twice told them to "[r]emember my instructions not to discuss the case or allow anyone to discuss it with you or in your presence." (Doc. 14-14 at 62-63). The prosecutor explained he was not going to the crime scene; trial counsel stated they would not attend; and Esposito waived his rights to attend. (Doc. 14-14 at 63-64). The trial judge informed Pritchett that he could walk the jury "over to the tree," and then could say, "this is where the body was found." (Doc. 14-14 at 65-66). Pritchett was instructed to say only "those words," and told not to answer any

questions.   (Doc. 14-14 at 65-67).   The trial judge explained to Pritchett that the jurors

should not be discussing the case among themselves.   (Doc. 14-14 at 65-66).        On

direct appeal, the Georgia Supreme Court raised *sua sponte* the issue of the crime scene

visit.   The court advised against allowing such visits:

> Although not raised as an enumeration of error, this procedure is troubling
> and should not be used in the future.   As we have stated before, a trial
> judge should attend any planned jury view.   Taking a jury from the
> controlled environment of a courtroom to a place that has some relevance
> to the trial always involves the risk that something unexpected might arise
> requiring the trial judge's intervention.   A court reporter should also
> attend any jury view so that any important statements or events may be
> thoroughly reviewed on appeal.   The attorneys should also attend, unless
> their presence is affirmatively waived.
>
> While a defendant's presence at a jury view that involves merely the
> transportation of the jury to a crime scene is not absolutely required, trial
> courts should note that a defendant's presence is mandatory, if not waived
> by the defendant himself, whenever testimony or other evidence is
> presented to the jury.   Special dangers exist whenever a witness at trial,
> particularly a law enforcement officer, attends a jury view, and a trial court
> should avoid those dangers by excluding such persons.
>
> Finally, because jury views have proved to be fertile ground for
> irregularity and, at times, reversible error, the parties to criminal trials and
> trial courts should carefully weigh the real benefits of a jury view before
> planning one.   Frequently, as in Esposito's case, the jury has already
> viewed photographs of the crime scene, and nothing is to be added to the
> jury's understanding of the issues to be tried by an in-person visit to the
> scene.   In such cases, a trial court would be authorized to deny a request
> for a jury view.

*Esposito*, 273 Ga. at 187, 538 S.E.2d at 59-60.   Even with this criticism, however,

the Georgia Supreme Court upheld Esposito's conviction and sentence.

    Before the state habeas court, Esposito challenged trial counsel's acquiescence to

the jury's judicially unsupervised crime scene visit.   The state habeas court explained:

> During the guilt-innocence phase of Petitioner's trial, the parties allowed an investigator in his case, the chief deputy sheriff of Morgan County, to accompany the jury to view the crime scene and to tell the jury where the body was found.   The judge, the court reporter, and the attorneys did not attend the jury viewing.   This Court agrees with the Supreme Court of Georgia that "this procedure is troubling and should not be used in the future."…   However, on the facts of this case, this Court finds no prejudice from the procedure or trial counsel's failure to object.

(Doc. 27-39 at 44).

Esposito claims that the juror affidavits he submitted, which the state habeas court refused to consider, showed prejudice.   At the state habeas evidentiary hearing, Esposito tendered four juror affidavits, two of which addressed the jury's crime scene visit.   (Doc. 19-2 at 46-52).   In her affidavit, alternate juror Tonya M. Samuels stated that the sheriff described details of the crime scene and, in his affidavit, juror Joe Taylor stated that the deputy showed the jurors where Mrs. Davis had been killed.   (Doc. 19-2 at 46-52).   Respondent objected to the admission of the affidavits because Esposito did not serve the affidavits at least ten days prior to the evidentiary hearing[43].   (Doc. 27-26 at 2).   The state habeas court ruled that, in reaching its conclusions, the affidavits would not be considered.   (Doc. 17-5 at 1).   However, it allowed the affidavits to be proffered for the record.   (Doc. 27-26 at 2).   Respondent then proffered his own rebuttal affidavits from these same two jurors.   (Docs. 27-26 at 2; 27-23 at 40-42, 45-46).   In the affidavit

---

[43] For a detailed discussion of state habeas counsel's tender of the juror affidavits, see the Court's July 18, 2013 Order denying Esposito's motion for an evidentiary hearing.   (Doc. 42 at 4-9).

tendered by Respondent, Samuels clarified that the sheriff who met the jurors at the

crime scene only told them where Mrs. Davis' body had been located and said nothing

else.   (Doc. 27-33 at 41-41).   Similarly, Taylor clarified that the sheriff only told them

where Mrs. Davis' body had been located and "never said anything else … about the

case."   (Doc. 27-33 at 45).   All of these affidavits were placed in the record that was

transmitted to the Georgia Supreme Court when Esposito filed his CPC application.   *See*

*Hittson*, 759 F.3d at 1231 (explaining that for the Georgia Supreme Court to fully consider

a CPC application, "O.C.G.A. § 9-14-52(b) directs the superior court clerk to transfer the

record and transcript of the proceedings below to the Supreme Court").

   In his CPC application, Esposito, in a footnote, argued that trial counsel were

ineffective for failing to challenge the crime scene visit.   (Doc. 27-41 at 44 n.17).   As

explained previously, the Georgia Supreme Court concluded all claims Esposito raised

lacked arguable merit and summarily denied the CPC application.   (Doc. 27-44).

   Esposito has failed to show the state habeas court's findings were based on

unreasonable factual determinations or involved an unreasonable application of

*Strickland*.   Additionally, the Georgia Supreme Court had the entire record from the

superior court, including all the affidavits that had been proffered for the record, to

review.   (Doc. 27-26 at 2).   Without elaboration, the Georgia Supreme Court found the

claim lacked arguable merit.   "Our task in these situations is to review the record before

the Georgia Supreme Court to 'determine what arguments or theories supported or, as

here, could have supported the state court's decision.'"  *Hittson*, 759 F.3d at 1232

(quoting *Pinholster* , 131 S. Ct. at 786).   Esposito's failure to show prejudice from the

crime scene visit, even when considering the proffered affidavits, supports the Georgia

Supreme Court's determination.   Certainly Esposito has not shown the Georgia

Supreme Court had "'no reasonable basis'" for denying this claim.   *Id*. at 1233 (quoting

*Pinholster*, 131 S. Ct. at 784).   Because he has not made such a showing, this Court must

deny relief.

      h.   <u>Trial counsel's failure to object to the prosecutor's sentencing phase closing argument</u>

Esposito argues the prosecutor made numerous improper arguments in his

sentencing phase closing argument:   (1) telling the jury the Sniders, who never missed

church, would never be able to go to church again (Doc. 56 at 124); (2) using "grandiose

Biblical quotations in exhorting the jury to impose a death sentence"[44] (Doc. 56 at 124);

(3) concluding his argument for imposition of the death penalty by stating, "But justice

would be when Mr. F. M. Davis goes to the Pearly Gates in heaven and sees his beloved

---

[44] The prosecutor's biblical references included:   (1) "How long—the good book says, 'How long shall the wicked be allowed to triumph and exalt.'   He's wicked."   (Doc. 14-24 at 80); (2) "'How these men of evil boast.'   He is a man of evil.   I'm not going to sugar coat it.   And he boasted.   He boasted.   These are his words, … his boasting….   And what did this man of evil boast?   I want you to picture him there … out in that Texas field with Mr. Snider and those six blows and his boast.   What did [Esposito] tell [Knight]?   'I don't have a conscience, no remorse.'"   (Doc. 14-24 at 82-83); and (3) "Dr. Harvey told us on Mrs. Marguerite Snider it was five hard blows, … so hard that one of these shattered her skull….   And what else did this man of evil—'how these men of evil boast'—on those five licks, what did he say when he was questioned by Ron Knight.   'I really do not care.' … 'Hey, I didn't even get brains on me.' 'Arise and judge the earth.'   Today is judgment day for John Anthony Esposito."   (Doc. 14-24 at 84-85).

wife of fifty years, Mrs. Lola, and he can say, 'honey, there was justice on this

earth.'"(Doc. 56 at 124-25); (4) stating Esposito would kill again because he took pleasure

from killing (Doc. 56 at 126); (5) referring to Esposito as "a serial killer" (Doc. 56 at 127);

(6) asking the jurors to speculate about the last moments of Marguerite Snider's life[45]

(Doc. 56 at 128); and (7) telling the jury that he "handle[s] lots of murder cases" and all

killings are brutal and senseless but these were "particularly malicious and brutal."

(Doc. 56 at 129).   Esposito argues that "[i]n remaining silent in the face of the

prosecutor's misconduct, counsel once again provided deplorably ineffective

representation."   (Doc. 56 at 123).

Respondent argues that Esposito raised only a general claim that trial counsel

failed to object to the improper and prejudicial statements made by the State during its

closing.   (Doc. 57 at 95-96).   He claims that none of these specific claims were alleged or

argued in the state habeas proceedings and they are, therefore, unexhausted.   (Doc. 57

at 95).   Alternatively, Respondent argues the claims are meritless.

The record shows Esposito's amended state habeas petition contained

approximately seventy-eight general ineffective assistance claims.   Two of which were

"[c]ounsel failed to object to improper and prejudicial statements made by the State

---

[45] The prosecutor stated, "Can you imagine 86 year old Marguerite Snider, married for sixty-two
and a half years to her beloved husband Larry to be sitting out in that Texas field watching that
man beat the brains out of her husband right in front of her.   She didn't even put up a fight.
We've been married sixty-two years.   He's 90.   Why fight him.   Take me, too.   I may as well
go with him.   I may as well go."   (Doc. 14-24 at 83-84).

during opening and closing arguments of both the guilt/innocence and sentencing phases of the trial" and "[c]ounsel failed to adequately and timely object to improper statements the prosecution made during closing arguments." (Doc 17-2 at 8, 10). He also alleged that his "rights to due process and a fair trial were violated by improper, prejudicial, and misleading remarks by the prosecution in its argument at Petitioner's trial" and "[t]o the extent that … counsel failed to object to these improper comments and seek a mistrial or other appropriate relief, or to otherwise preserve objections to the State's argument …, counsel were ineffective, and Petitioner was prejudiced thereby." (Doc. 17-2 at 14-15 n.4).

In his post-hearing brief and CPC application, Esposito argued that "[a]t the close of both phases of [his] trial, the State presented argument to the jury that was improper, misleading, and prejudicial." (Doc. 28-1 at 3). His specific claims were: (1) the prosecutor improperly told the jury that, if not sentenced to death, Esposito would kill again because he liked killing people (Docs. 27-41 at 48-49; 28-1 at 3); (2) the prosecutor improperly referred to Esposito as a serial killer (Docs. 27-41 at 48-49; 28-1 at 4); and (3) the prosecutor improperly claimed he was an expert in murder cases and this murder deserved the death penalty (Docs. 27-41 at 49; 28-1 at 4-5). In his post-hearing brief, he claimed that "[a]lthough Mr. Esposito's attorneys were ineffective for failing to ensure that the jury not base its decisions o[n] emotion and passion, this Court cannot ignore the State's improper actions, merely because Mr. Esposito's counsel failed to properly object

and litigate them." (Doc. 27-34 at 77). In his CPC application, he alleged that "Esposito's attorneys were ineffective for failing to challenge the improper arguments … of the State…."[46] (Doc. 27-41 at 44 n.17).

Thus, it seems Esposito exhausted three of his seven specific claims that trial counsel were ineffective for failing to object during the prosecutor's sentencing phase closing argument. Relying on a doctrine first announced in *Vela v. Estelle*, 708 F.2d 954 (5th Cir. 1983), Esposito argues the remaining four[47] claims are exhausted. According to *Vela*, if the state court that reviewed the ineffective assistance claims considered trial counsel's conduct as a whole, on the basis of the entire record, and the new claims alleged in the federal petition stem from conduct that appears in that record, the new claims are considered exhausted. *Id*. at 960. Based on this, Esposito claims that "the specific instances of counsel's ineffectiveness in failing to object to portions of the closing argument are clearly subsumed with the broader … claim that counsel were ineffective in failing to object to the prosecutor's improper argument." (Doc. 58 at 14).

It is less than clear if *Vela* is still good law in the Eleventh Circuit. While the

---

[46] As explained previously, the state habeas court's order did not address every ineffective assistance claim in detail, but the order provided that all such claims were denied on the basis of Esposito's failure to show deficient performance and prejudice and the Georgia Supreme Court summarily denied Esposito's CPC application. (Docs. 27-39 at 44; 27-44).

[47] The remaining four claims are: (1) Telling the jury the Sniders would never be able to go to church again (Doc. 56 at 124); (2) using "grandiose Biblical quotations" (Doc. 56 at 124); (3) asking the jury to speculate about the final moments of Mrs. Snider's life (Doc. 56 at 128); and (4) concluding his closing argument by saying if the death penalty is imposed, Mr. Davis will be able to tell Mrs. Davis there was justice on earth when they meet at the "Pearly Gates." (Doc. 56 at 124-25).

Court expressed approval of the *Vela* doctrine in *Francis v. Spraggins*, 720 F.2d 1190, 1193 n.6 (11th Cir. 1983), it expressly declined to address the continuing validity of V*ela* in a later case—*Footman v. Singletary*, 978F.2d 1207, 1211 n.4 (11th Cir. 1992). More recently, in *Kelly v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317 (11th Cir. 2004), the Eleventh Circuit held that generalized allegations of ineffective assistance of counsel do not preserve for federal review all specific instances of ineffectiveness. (Doc. 57 at 96). Instead, to exhaust, a habeas petitioner must first present each particular factual instance of ineffective assistance of counsel to the state courts before raising them in his federal petition. *Id*. at 1344-45.

While under *Vela*, all of Esposito's claims might be exhausted, it appears four of his specific ineffective assistance claims would not be exhausted under *Kelly*. The Court need not decide this issue because it agrees with Respondent that even if all of these ineffective assistance claims are exhausted, they are meritless because Esposito "cannot show merit in his underlying misconduct claim." (Doc. 57 at 96). He "has failed to show his trial fundamentally unfair." (Doc. 57 at 96).

Esposito can show prejudice resulting from trial counsel's failure to object to the prosecutor's closing arguments only if the improper prosecutorial argument claim itself warrants relief. *Land v. Allen*, 573 F.3d 1211, 1221 (11th Cir. 2014). "[T]he bar for granting habeas based on prosecutorial misconduct is a high one." *Id*. at 1220. To find prosecutorial misconduct, the remarks must be improper and must have "'so infected

the trial with unfairness as to make the resulting conviction a denial of due process.'"

*Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

> An improper prosecutorial argument has rendered a capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, which is to say that absent the argument the defendant would not have received a death sentence. A reasonable probability is one that is sufficient to undermine the confidence in the outcome.

*Romine v. Head*, 253 F.3d 1349, 1366 (11th Cir. 2001).

Even assuming that the prosecutor's arguments were improper, Esposito has not shown that, absent the remarks, he would not have received a death sentence. Given this, his underlying prosecutorial misconduct claims would not warrant relief. Esposito "cannot show prejudice in his [trial] counsel's failure to object to prosecutorial misconduct that, itself, does not warrant reversal." *Land*, 573 F.3d at 1211. Under AEDPA, Esposito certainly has not shown that no fairminded jurist could agree with the Georgia Supreme Court's decision that these ineffective assistance claims lacks merit. *Richter*, 131 S. Ct. at 786. Thus, this Court must deny relief.

i.    Trial counsel's presentation of the sentencing phase closing argument

Esposito claims that trial counsel were ineffective in their presentation of the sentencing phase closing argument because they "made minimal reference to the mitigating circumstances and made a lukewarm plea to spare [his] life." (Doc. 56 at 94-95). Respondent claims the state habeas court properly denied this claim finding Esposito "failed to prove both the deficiency and prejudice prongs of the test for

reviewing claims of ineffective assistance of counsel."   (Doc. 57 at 88).   Esposito also

raised the issue in his CPC application, which the Georgia Supreme Court summarily

denied.   (Docs. 27-41 at 38-40; 27-44).

In the closing argument, it appears trial counsel attempted to respond to the

Sniders' gruesome murder by stressing that Esposito had not been tried or convicted for

those crimes.   Trial counsel emphasized that he would face those charges in the future

in Texas.   (Doc. 14-25 at 2).

Trial counsel asked the jury to consider Esposito's troubled past when deciding

what his sentence should be.   Kelly argued:

> You heard the witnesses today, and they were John's friends and family, …
> [and] psychologist….   And there is no question that this young man has a
> lot of problems.   Does that excuse what he did?   Absolutely not.
> Absolutely not.   There is no one here saying that excuses what he did.   Is
> it a factor in mitigation?   Absolutely.
> …
> The only two times it appears that John had any structure in his life was
> when he was at the mental institution in New Jersey and strangely enough,
> the other time was in the Jasper County jail.

(Doc. 14-25 at 2-4).

They stressed that Esposito was not a "con man" as the prosecutor had argued.

(Doc. 14-25 at 4).   He had not been able to "con" the chief jailer at the Jasper County Jail,

where he had lived for over two years.   Instead, when he left to attend trial, she

"hugged his neck" and even spoke on his behalf during the sentencing phase of the trial.

(Doc. 14-25 at 5).

Kelly stressed that the jury had a tremendous responsibility and should they decide to impose death, that would be "an irreversible decision," with which they would have to live. (Doc. 14-25 at 3). He asked the jury not to get "caught up in the frenzy that [the prosecutor] is trying to get you caught up in." (Doc. 14-25 at 3). Instead, they should choose punishment, not revenge:

> It's in your hands. You've got a choice of revenge, and that's what [the prosecutor] wants you to do. If you want revenge, then death is what you will give. But I beg you to choose punishment over revenge. You can give him life or life without parole and that is a very horrible, horrible punishment. There is a young man sitting about thirty feet away from you right now that literally will live or die with your decision and I humbly bet you to choose punishment over revenge.

(Doc. 14-25 at 5).

The Eleventh Circuit has explained that "[d]eficient performance is demonstrated by an attorney's failure to use the closing argument to focus the jury's attention on his client's character or any mitigating factors of the offender's circumstances, and by his failure to ask the jury to spare his client's life." *Lawhorn v. Allen*, 519 F.3d 1272, 1295 (11th Cir. 2008). Kelly's closing argument can certainly be criticized. It was, as Esposito argues, brief. Also, he undoubtedly could have placed more emphasis on "Esposito's upbringing and psychiatric history." (Doc. 56 at 96). However, Kelly did explain to the jury that Esposito's "problems" were mitigating and he did plead with them to spare Esposito's life. Given AEDPA deference, this Court cannot find the state habeas court's decision that counsel performed reasonably and Esposito was not

prejudiced involved an unreasonable application of *Strickland* or was based on any unreasonable determinations of fact.   Moreover, Esposito has not shown the Georgia Supreme Court had no reasonable basis for denying relief.   This is especially true regarding prejudice.   The Georgia Supreme Court could reasonably have determined that Esposito failed to show that, but for Kelly's closing argument, the result of his sentencing proceeding would have been different.   Therefore, the Court denies relief on this claim.

j.   Ineffective assistance at the motion for new trial and on direct appeal

Esposito argues that counsel ineffectively handled his motion for new trial and direct appeal.[48]   (Doc. 56 at 141-42).   In relation to the motion for new trial, Respondent argues that "during state habeas proceeding [Esposito] failed to allege much less argue counsel were ineffective during the Motion for New Trial."   (Doc. 57 at 101).   Therefore, according to Respondent, this claim is unexhausted.   Esposito claims he exhausted this issue and points to his amended state habeas petition, in which he complained that "[c]ounsel failed to present these[49] issues during the Motion for New Trial and on appeal to the Georgia Supreme Court."   (Doc. 17-2 at 10).   In his CPC application, however, Esposito makes no mention of counsel's performance during the motion for new trial.   Claims not contained within a petitioner's CPC application are

---

[48] *Strickland* applies to appellate counsel.   *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).
[49] Presumably "these" refers to numerous instances of trial court error and prosecutorial misconduct that he alleged in his state habeas petition.   (Doc. 17-2 at 5-10).

unexhausted. *Hittson*, 759 F.3d at 1232 n.23. Thus, Esposito's claim that counsel were ineffective during the motion for new trial is unexhausted and procedurally defaulted. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1989) (explaining that "when it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief").

Esposito alleges he can overcome the default by showing cause and prejudice. Citing *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), Esposito "makes conclusory assertions in his brief that his post-conviction counsel performed deficiently" and this deficiency provides the cause necessary to overcome default. *Fults v. GDCP Warden*, 764 F.3d 1311, 1314-15 (11th Cir 2014). He also alleges that he is entitled to an evidentiary hearing to determine whether, in fact, his post-conviction counsel were ineffective for failing to raise the claim.

*Martinez* and *Trevino* apply in a very limited context,[50] both in terms of when the attorney omission constituting cause occurred and what particular omission occurred. As to the first limitation, "the *Martinez* Court expressly limited its holding to attorney errors in initial-review collateral proceedings." *Arthur v. Thomas*, 739 F.3d 611, 629 (11th Cir. 2004). Specifically, the Supreme Court stated that "[t]he holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from

---

[50] The Eleventh Circuit has not determined if *Martinez* or *Trevino* apply at all to Georgia criminal procedures.

initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Martinez*, 132 S. Ct. at 1320. Instead, the rule in *Coleman v. Thompson*, 501 U.S. 722 (1991)—that inadequate post-conviction counsel does not provide cause to overcome procedural default—governs in all these scenarios.

In Esposito's case, assuming state habeas counsel were ineffective for failing to raise his motion for new trial ineffectiveness claim, it appears from the record that the deficient performance occurred when they failed to include the claim in the CPC application. Inadequate performance during the appeal from denial of habeas relief cannot provide cause. *Martinez*, 132 S. Ct. at 1320; *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012) (explaining that *Martinez* offers no support "for the contention that the failure to preserve claims on appeal from a postconviction proceedings can constitute cause").

As for the second limitation, *Martinez* and *Trevino* altered *Coleman* only with respect to "claims of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1319. In Esposito's case, his underlying claim is that counsel were deficient during the motion for new trial, not during trial. It is unclear if *Martinez* and *Trevino* would even apply in such a situation.

Assuming for the sake of argument that *Martinez* and *Trevino* apply,[51] Esposito

---

[51] This assumes that *Martinez* and *Trevino* apply (1) to Georgia criminal procedure, (2) when

has not established that his post-conviction counsel were ineffective under the standards

of *Strickland* or that the underlying ineffective assistance of motion for new trial counsel

claim is a substantial one.   Nor do his general and conclusory allegations entitle him to

an evidentiary hearing.   "[A] petitioner does not establish constitutionally deficient

performance simply by showing that (a) potentially meritorious claims existed and (b)

his collateral counsel failed to raise those claims."   *Hittson*, 759 F.3d at 1263 (citing

*Murray v Carrier*, 477 U.S. 478, 486 (1986)).   Esposito would have to "show that *no*

*competent counsel*, in the exercise of reasonable professional judgment, would have

omitted" his claim that counsel were ineffective for not raising more claims in his motion

for new trial.   *Id.* (emphasis in the original).   State habeas counsel raised numerous

ineffective assistance claims in their CPC application.   (Doc 27-41 at 1-54).   Esposito

simply "has alleged no facts to overcome the presumption that they exercised reasonable

professional judgment in deciding which claims to raise and which claims to omit."   *Id*.

at 1264.

    As for the underlying motion for new trial ineffective assistance claim, Esposito's

entire argument consists of one paragraph in his brief, in which he he criticizes the

brevity of the action motion for new trial and complains that the "hearing conducted on

the motion consists of a scant 11 transcript pages."   (Doc. 56 at 141 -42).   Counsel

explained, both during the motion for new trial itself and during the state habeas

---

post-conviction counsel fail to raise the claim in a CPC application, and (3) when the underlying
claim is ineffective assistance during a motion for new trial.

evidentiary hearings, why they focused on one particular argument. Their thought was that "other than the confessions, there was not anything much tying [Esposito] as the person who actually committed the crime." (Docs. 15-14 at 3; 17-10 at 43). Thus, they believed that the confession the jury heard from Knight was the "one piece of evidence that … caused the jury to find … Esposito guilty and place him in the electric chair." (Doc. 15-14 at 3; 17-10 at 44). They also believed they had good grounds[52] for challenging the admission of the confession. (Doc. 17-10 at 82). In short, they thought this was their best argument. (Doc. 17-11 at 63). "'Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.'" *Hittson*, 759 F.3d at 1263 (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). Therefore, by simply alleging that counsel's motion for new trial was too short and their argument too brief, Esposito has not alleged a "substantial" ineffective assistance claim.

Esposito also claims that appellate counsel were ineffective because they raised only two claims on direct appeal: (1) a challenge to the trial court's denial of the motion to suppress Esposito's confession to the FBI and (2) a challenge to the method of execution. (Doc. 15-15). Respondent argues that some of the specific claims of ineffective assistance of appellate counsel that Esposito raises in his federal habeas

---

[52] They argued the confession was not freely and voluntary given because: Esposito was young; he had little education, and the interrogation took place many hours after he was given the *Miranda* warnings. (Doc. 15-14).

petition have not been exhausted and are procedurally defaulted. (Doc. 57 at 90 n.10).

Alternatively, he argues the state habeas court's decision finding appellate counsel

performed effectively was reasonable. (Doc. 57 at 90).

In his amended state habeas petition, Esposito alleged "[c]ounsel failed to present

these issues[53]… on appeal to the Georgia Supreme Court." (Doc. 17-2 at 10). He also

maintained that

> [c]ounsel rendered ineffective assistance on appeal when they
> unreasonably and prejudicially failed to raise meritorious issues on
> appeal…. Such issues include, but are not limited to, failing to argue that
> it was reversible error for a prosecution witness to escort the jury to view
> the crime scene, failing to appeal the trial court's erroneous rulings on
> prospective jurors, and failing to appeal the erroneous instructions that
> were given to the jury.

(Doc. 17-2 at 11). Esposito also claimed "the State made improper, misleading

arguments," "presented irrelevant and prejudicial evidence," and "elicited extensive

information about the victims." (Doc. 17-2 at 14). In a footnote, he alleged that

appellate counsel were ineffective for failing to raise these issues on appeal. (Doc. 17-2

at 15 n.4).

In their post-hearing brief, state habeas counsel argued appellate counsel were

ineffective because they raised only two claims on appeal while "Esposito had at least

---

[53] It appears "these issues" refer to the numerous alleged trial errors listed in the amended state habeas petition. These include the prosecutor's presentation of inadmissible evidence (Doc. 17-2 at 4-5, 7), the prosecutor's allegedly improper examination and cross-examination of witnesses (Doc. 17-2 at 7-9), the prosecutor's allegedly improper closing (Doc. 17-2 at 8, 10), and the crime-scene visit. (Doc. 17-2 at 9)

three viable issues that could have been properly raised." (Doc. 27-34 at 70). These "three viable issues" were (1) the improper introduction of the Texas crime scene videotape, (2) the prosecution's improper suggestion to the jury that Mr. Esposito's psychological problems do not constitute mitigation under Georgia law, and (3) a sentencing disproportionality claim. (Doc. 27-34 at 70-73).

The state habeas court ruled that counsel "were objectively reasonable when they raised their two strongest, non-frivolous claims on direct appeal to the Georgia Supreme Court." (Doc. 27-39 at 43). Having found the conduct of appellate counsel reasonable, the court did not address prejudice. (Doc. 27-39 at 43-44).

In their CPC application, state habeas counsel faulted appellate counsel for raising only two issues on appeal and pointed to the same "three viable issues" that appellate counsel should have raised. (Doc. 27-41 at 41-43).

In his federal habeas briefs, Esposito argues that appellate "counsel performed deficiently in failing to raise claims challenging the prosecutor's improper presentation of inadmissible evidence; the prosecutor's misconduct in presenting evidence and cross-examining defense witnesses; the prosecutor's improper closing arguments; and the extra-judicial crime scene visit." (Doc. 56 at 147).

Respondent claims Esposito has exhausted only his claim that appellate counsel were deficient for failing to raise the improper introduction of the Texas crime scene videotape. (Doc. 57 at 100). Presumably this claim is encompassed within Esposito's

current broader claim that appellate "counsel performed deficiently in failing to raise claims challenging the prosecutor's improper presentation of inadmissible evidence." (Doc. 57 at 100). At any rate, appellate counsel's failure to raise the admission of the Texas crime videotape was one the "three viable issues" that Esposito raised in his CPC application and the claim is, therefore, exhausted. (Doc. 27-34 at 70). Esposito also exhausted his claims that appellate counsel should have raised the prosecutor's improper suggestion that Esposito's psychological problems are not mitigating.[54] (Doc. 27-41 at 41-43).

All other claims of ineffective assistance of appellate counsel have not been exhausted and are procedurally defaulted.[55] Although Esposito makes the conclusory assertion that ineffective assistance of state habeas counsel provides cause to overcome the default, "he does not explain why the performance was deficient or how, if the performance was deficient, he was prejudiced." *Fults*, 764 F.3d at 1315. Moreover, Esposito has cited no authority for the argument that *Martinez* and *Trevino* apply when the underlying claim is ineffective assistance of appellate counsel, versus ineffective assistance of trial counsel. The Eleventh Circuit has "repeatedly underscored the

---

[54] Presumably this claim is encompassed in Esposito's current broader claims that appellate counsel should have raised the prosecutor's improper questioning of defense witnesses and improper closing argument. (Doc. 56 at 147).

[55] As for Esposito's argument that appellate counsel were ineffective for failing to raise the jury's visit to the crime scene (Doc. 56 at 147), the Georgia Supreme Court addressed this issue *sua sponte* and, while criticizing the practice, affirmed Esposito's conviction and sentence. *Esposito*, 273 Ga. at 187, 538 S.E.2d at 59-60.

narrow scope" of *Martinez* and *Trevino*, emphasizing that the equitable rule established

in the cases "applies only 'to excusing a procedural default of ineffective-trial counsel

claims.'" *Chavez v. Sec'y, Fla. Dep't of Corr.*, 742 F.3d 940, 945 (11th Cir. 2014).

In relation to the ineffective assistance of appellate counsel claims that have been

exhausted, Esposito has not shown the state courts' determinations were unreasonable.

When discussing the direct appeal, counsel testified that they did not believe in the

"shotgun approach" to appeals.   (Doc. 17-10 at 82).   Instead, they wanted to "raise the

valid issues and not just throw something out there."   (Doc. 17-10 at 82).   Just as with

the motion for new trial, they thought the best argument they had was to challenge the

trial court's denial of their motion to suppress Esposito's confession to the FBI.   (Doc.

17-11 at 62-63).   The state habeas court found "counsel's reasoning in raising their two[56]

strongest, non-frivolous claims on appeal was objectively reasonable" and the Georgia

Supreme Court found no arguable merit to Esposito's ineffective assistance of appellate

counsel claim.   (Docs. 27-39 at 43; 27-44).

The Supreme Court and the Eleventh Circuit have both explained the benefits of

concentrating on "one central issue" or "a few key issues" for appeal.   *Jones*, 463 U.S. at

751-52; *Hittson*, 759 F.3d at 1263.   To show that appellate counsel "failed to provide the

level of representation required by *Strickland*, [Esposito] must show more than the mere

fact that they failed to raise potentially meritorious claims; he must show that no

---

[56] As explained above, appellate counsel also argued that execution by electrocution is cruel and unusual punishment.   *Esposito*, 273 Ga. at 185-86, 538 S.E.2d at 58-59.

competent counsel, in the exercise of reasonable professional judgment, would have omitted the claims." *Hittson*, 759 F.3d at 1263. He has not made such a showing. He certainly has not shown that the Georgia Supreme Court had "no reasonable basis … to deny relief." *Id.* at 1233. Thus, this Court must deny relief.

**B.   Claim Two:   Misconduct by the prosecution team and other state agents deprived petitioner of his constitutional rights to due process and a fair trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Esposito agrees with Respondent that his claim "the State suppressed evidence relating to improper communications between Petitioner's jailers and prospective jurors" is unexhausted and he, therefore, withdraws it. (Doc. 56 at 20).

In a footnote of his brief, Esposito claims that "the prosecutor's actions and argument" violated his due process rights. (Doc. 56 at 98 n.67). He is referring to the prosecutor's cross-examination of his mental health expert, examination of the State's witnesses, presentation of victim impact evidence, penalty phase closing argument, and presentation of the Texas crime scene videotape. (Doc. 56 at 97-133). Esposito concedes these prosecutorial misconduct claims are procedurally defaulted. (Doc. 56 at 98 n. 67). He argues that ineffective assistance of counsel provides the cause to overcome the default. For reasons discussed above, Esposito has not established ineffective assistance of counsel. Thus, these claims are procedurally defaulted and the Court does not address their merits.

**C.  Claims Three through Five:**

Esposito does not address these three claims in his briefs. (Docs. 56, 58).

"[M]ere recitation in a petition, unaccompanied by argument, in effect forces a judge to research and thus develop supporting arguments—hence litigate—on a petitioner's behalf. Federal judges cannot litigate on behalf of the parties before them, and it is for this reason that any claims in [Esposito's] petition that were not argued in his brief are abandoned." *Blankenship v. Terry*, 2007 WL 4404972 at *40 (S.D. Ga.), *aff'd* 542 F.3d 1253 (11th Cir. 2008) (citing *United States v. Burkhalter*, 966 F. Supp. 1223, 1225 n.4 (S. D. Ga. 1997); *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998)).

**D. Claims Six through Ten:**

Esposito withdraws these claims.[57] (Doc. 56 at 21-23).

**E. Claim Eleven: The execution of Petitioner by lethal injection is cruel and unusual punishment in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

A habeas action is not the appropriate vehicle for attacking Georgia's lethal injection procedures; rather, that challenge must be raised in a 42 U.S.C. § 1983 action. *Tompkins v. Sec'y Dep't Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009); see *Hill v. McDonough*, 547 U.S. 573, 579-83 (2006); *Thomas v. McDonough,* 228 F. App'x 931, 932 (11th Cir. 2007)

---

[57] To the extent Claim Six—allegations that the death penalty in Georgia is imposed arbitrarily and capriciously and amounts to cruel and unusual punishment—raises a challenge to the lethal injection procedure in Georgia, this issue is contained in Claim Eleven of Esposito's federal habeas petition and is discussed in section III E of this Order.

(holding that "§ 1983 and § 2254 are mutually exclusive," and that if a claim can be brought under § 1983, it "cannot be brought under § 2254"). The Eleventh Circuit has explained:

> Usually an inmate who challenges a state's method of execution is attacking the means by which the State intends to execute him, which is a circumstance of his confinement. It is not an attack on the validity of his conviction and/or sentence. For that reason, "[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures." Hence, … the district court did not err in dismissing [the petitioner's] lethal injection challenge in his federal habeas petition. That avenue of relief is still available to him in a § 1983 action.

*McNabb v. Comm'r Ala. Dep't of Corr.*, 727 F.3d 1334, 1344 (11th Cir. 2013) (quoting

*Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1261 (11th Cir 2009)).

Claim eleven is dismissed.

## IV. CONCLUSION

For the reasons explained above, Esposito's petition for writ of habeas corpus is **DENIED**.

## CERTIFICATE OF APPEALABILITY

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a Certificate of Appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). As amended effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a [COA] when it enters a

final order adverse to the applicant," and if a COA is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

The Court can issue a COA only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To merit a COA, the Court must determine "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations omitted). If a procedural ruling is involved, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Under this standard, the Court issues a COA on the following issues: Whether trial counsel were ineffective in failing to investigate and present evidence to support their defense theories that Esposito was less culpable that Woodward and that his personal history of abuse and mental illness was mitigating.

In relation to all other claims, grounds, and issues raised in Esposito's petition for writ of habeas corpus (Doc. 1), the Court finds the standard shown above for the grant of a COA has not been met.

**SO ORDERED**, this 10th day of December, 2014.

                                        S/ C. Ashley Royal
                                        C. ASHLEY ROYAL, JUDGE
                                        UNITED STATES DISTRICT COURT